545 A.2d 17

**Diane O'LEARY**

v.

**Larry W. SHIPLEY.**

**No. 138, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 2, 1988.

Sharon E. Haynie, Columbia (American Civ. Liberties Union of Maryland on brief, Baltimore), for appellant.

Julia M. Freit, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

In May 1986 Diane O'Leary, a deputy clerk of the Circuit Court for Carroll County, filed as a Democratic candidate in

the November election for Clerk of that Court, an office created by Article IV, § 25 of the Maryland Constitution. The office was then held by O'Leary's ultimate supervisor, the incumbent Clerk, Republican Larry Shipley. Shipley prevailed in the election. On the day of his investiture for a new four-year term as Clerk, Shipley informed O'Leary that he would not reappoint her as deputy clerk.[1]

O'Leary, who had served as deputy clerk for ten years, subsequently filed a complaint in the Circuit Court for Carroll County against Shipley. She sought reinstatement and back pay, claiming that Shipley had wrongfully refused to reappoint her because she opposed him in the election. The complaint alleged that the Clerk thereby contravened By-law X of the Maryland Court Clerks' Association, which prohibits the Clerk from refusing to employ or failing to promote "any individual because of race, sex, color, religion or national origin or political affiliation." O'Leary's complaint set forth excerpts from a memorandum which Shipley had written wherein he advised her that she would not be reappointed. According to the complaint, Shipley's memorandum to O'Leary evidenced "retaliatory" intent as follows:

"This is to confirm the meeting today with you and Joyce. During the meeting I indicated that since the election, I have had to make certain decisions as to certain things, including personnel, for the best interest of the employees and the office.

---

1. Section 26 of Article IV of the Maryland Constitution requires the Clerk of each circuit court to appoint, subject to confirmation by the judges of the respective courts, "as many deputies" as the judges deem necessary for the performance of the duties of the Clerk. Deputy clerks are appointed for the same term as the Clerk; they are subject to reappointment by the Clerk at the beginning of the Clerk's new term of office, but there is no requirement that the Clerk reappoint them. *See* 43 Op. Att'y Gen. 119 (1958). Deputy clerks are removable by the judges of the respective circuit courts for incompetency or neglect of duty. Article IV, § 26 of the Maryland Constitution.

Deputy clerks are not mere agents of the Clerk; rather, they are agents and officers of the court. *State, Use of Smith v. Turner,* 101 Md. 584, 61 A. 334 (1905).

"One of the decisions was whether or not to reappoint every one as Deputy Clerks.

"I sincerely feel that under the present circumstances that we cannot continue to work together. Therefore, I advised you that I would not be reappointing you as a Deputy Clerk and that I would give you a couple of weeks, until December 12, 1986, to find other employment."

Shipley moved to dismiss the complaint. Citing Supreme Court cases on political patronage dismissals, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), Shipley asserted that to prevail O'Leary was required to allege and prove that he had failed to reappoint her solely from a political patronage motive. Shipley maintained in his motion to dismiss that because he had reappointed several other deputy clerks who were Democrats, including some who had supported O'Leary in the election, O'Leary failed to make out a prima facie case under *Elrod* and *Branti*. Shipley also maintained that the "political motive" emphasis which O'Leary placed on the timing of her failure to be reappointed—*i.e.*, almost immediately after the election—was without foundation because this was the most convenient opportunity to replace any deputy clerks, regardless of the reason that replacement was deemed necessary. Responding to Shipley's motion to dismiss, O'Leary agreed that the *Elrod–Branti* "sole motive" test was controlling; she claimed that these requirements were satisfied.

The court denied Shipley's motion to dismiss, and the matter went to trial. The only evidence presented in O'Leary's case was her own testimony. She stated that she had never received any complaints from Shipley regarding her work performance during her ten years of service as a deputy clerk. She described the election campaign as "agreeable ... almost uneventful.... I had five specific things, I think, that I wanted to challenge and nothing ever got to a personal nature because I don't think that's proper

in politics." Of the twenty or twenty-one deputy clerks in the office, she said that she was the only one not reappointed. On cross-examination she spoke of the issues which had been raised during the campaign:

"I criticized hiring practices which I didn't zero in on Mr. Shipley particularly. I just said that I would hire differently. I would open hire instead of closed hiring ...[;] I feel that when you hire for a State job, you should be able to advertise. That would have been my selection versus going mouth by mouth to find out who was available.... Another issue I had was cross-training. Mr. Shipley does the way he wanted to, cross-training would have been my selection."

Asked on redirect why she raised these issues, she said:

"I don't see how you can campaign and get people's attention without having some kind of a format, a platform. And if you just go along and say, 'Ladies and Gentlemen, I agree with Mr. Shipley but put me in office,' you're not going to get a vote."

Shipley's evidence was limited to his own testimony. Asked what factors he considered when deciding whether to reappoint a deputy clerk, he said:

"Job performance, their ability to get along with other people, how their presence in the office affects the other employees and how it affects the office as a whole."

With respect to O'Leary, Shipley testified that

"there had been some problems for a year or so before the election with another employee that was constantly criticized by Diane [O'Leary], the way she did things in the courtroom, the way she performed her duties. There was another incident of another employee that they just couldn't get along and it was a constant, well, the other employee almost quit, you know, several times."

Shipley further testified:

"During the campaign ... I was criticized for the way I ran the office as far as hiring; there were remarks made, quoted in the newspapers that ... I was doing nothing,

that I was moving slowly and, in fact, I turned money back to the State when I was offered money for computer systems which was false. There were comments made and one of those sore spots with me was that I was, in essence, turning money over to the State that should be kept in Carroll County for the people of Carroll County. And we are under the budget, that was money in excess of our budget and that was money I had to turn back.... [O]ne of the final things that I considered was the day after the election Diane did not come into work."

Asked how he reacted to O'Leary's remarks about his performance in the clerk's office, Shipley said:

"I took it very personal and ... it was false.... I think it was being done to mislead the public and that's why it upset me. And I just felt that under those circumstances ... I had to make a choice."

Shipley's direct examination continued:

Q. "[Y]ou said that you did not feel under the circumstances that you and the Plaintiff could work well together. Could you explain a little bit more?

A. "With what had happened for the year or two before the election with some of the employees, with what happened during the election with the comments that were being made, I just felt that we could not work together.... I try to work with the people and I don't mind criticism if it's constructive but I think when the motive is different than just helping me ... that's why I object to it."

Shipley acknowledged that except for O'Leary he reappointed all other deputy clerks, including those that supported O'Leary. He stated that although he knew that two of these deputy clerks were Republicans, he was unaware of his deputy clerks' political affiliations because "that's never a question when we hire them and ... it doesn't really bother me what their affiliations are." He thought O'Leary was a Republican until she ran against him as a Democrat. On cross-examination Shipley testified that prior to the election he had been basically satisfied with

O'Leary's job performance, and that he had never brought any performance problems to her attention in writing. He stated that he did have some conversations with her concerning certain problems with other employees. He also testified that O'Leary was unhappy with her last duty assignment, which kept her from the courtroom.

The court entered judgment for Shipley; it said:

"[T]he real essence of this case is was Mrs. O'Leary discharged for purely political reasons. And I find, based upon ... the preponderance of the evidence, that she was not discharged purely for political reasons. The Court finds ... that there obviously were some problems in the office with some other employees, that Mrs. O'Leary was having some problems, she had been no longer in the court and she was out doing clerical work in the office and obviously dissatisfied.... I don't believe that Mrs. O'Leary has brought forth sufficient evidence to show that ... Mr. Shipley discharged her for purely political reasons."

O'Leary appealed to the Court of Special Appeals. She contended that the *Elrod–Branti* "sole motive" test was not applicable to her case. Rather, she asserted, the appropriate test was that developed by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and its progeny, especially *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under these cases, according to O'Leary, once she proved that the exercise of her First Amendment rights was a motivating factor in the denial of her reappointment, the burden of persuasion shifted to Shipley to prove by a preponderance of the evidence that he would not have reappointed her irrespective of the exercise of her First Amendment rights. In O'Leary's view the trial court committed error by applying the *Elrod–Branti* test, and thus a new trial was warranted. Prior to consideration of the appeal by the Court of Special Appeals, we granted certiorari on our own motion.

I

■ We first consider whether the theory on which this case proceeded at the trial level impairs review in this Court on the particular First Amendment grounds now advanced. O'Leary's complaint did not explicitly invoke the First Amendment; it was brought into the case by Shipley's motion to dismiss, in which he asserted that the *Elrod–Branti* "sole motive" test was applicable and had not been satisfied. O'Leary seemingly accepted the test as controlling, and the case proceeded to judgment on this basis. O'Leary now asserts that a different First Amendment theory governs this case.

Maryland Rule 8–131(b)(2) provides that when, as here, no prior appellate decision has been rendered, we will consider those issues which would be cognizable in a case on direct appeal. On direct appeal we ordinarily do not decide points or questions not plainly appearing by the record to have been tried and decided by the trial court. Rule 8–131(a). On the present facts, however, the general question of the application of the First Amendment to O'Leary's nonreappointment was tried and decided by the trial court, even though the question was not explicitly raised by O'Leary's complaint. In the circumstances, we deem it appropriate, and not inconsistent with Rule 8–131, to consider the issue. We do so notwithstanding the fact that on appeal O'Leary invokes a First Amendment theory different from that on which the case was decided below, for a necessary part of reviewing the correctness of the trial court's constitutional adjudication is the determination whether the proper First Amendment theory was applied.

II

We must first decide whether the *Elrod–Branti* and *Pickering–Mt. Healthy* lines of cases state two different tests for two different factual situations. If they do, we must determine into which line of cases the present controversy falls.

(A)

In *Elrod v. Burns, supra,* the Supreme Court in a plurality opinion considered whether public employees alleging discharge solely because of partisan political affiliation stated a claim for deprivation of First and Fourteenth Amendment rights. In that case the Sheriff of Cook County, Illinois, a Republican, was replaced by Richard Elrod, a Democrat. In accordance with an established practice of political patronage, Elrod promptly discharged several employees solely because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders. In holding that the employees stated a valid cause of action, the Court reasoned that patronage dismissals compel political orthodoxy and restrain political associations, and thus are " 'at war with the deeper traditions of democracy embodied in the First Amendment.' " 427 U.S. at 357, 96 S.Ct. at 2682 (quoting *Illinois State Employees Union v. Lewis,* 473 F.2d 561, 576 (7th Cir.1972)). The Court stated that such dismissals (other than from policy-making positions) fall within the prohibition set forth in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Elrod, supra,* 427 U.S. at 359, 96 S.Ct. at 2682.

In *Branti v. Finkel,* decided in 1980, the Court considered whether the holding in *Elrod* was limited to situations in which government employees are coerced into pledging allegiance to a political party or whether it also applies to a simple requirement that an employee be sponsored by the party in power. In that case two county assistant public defenders brought a civil rights action alleging that Branti, the newly appointed public defender, was about to discharge them solely because they were Republicans. The assistant public defenders sought and were granted an injunction by the federal district court on the basis of *Elrod.* On appeal Branti contended that *Elrod* should be

read to prohibit only dismissals resulting from an employee's failure to capitulate to political coercion. Rejecting this notion, the Court stated:

> "[T]here is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance. To prevail in this type of an action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by the Democratic Party.'" 445 U.S. at 517, 100 S.Ct. at 1294.

Almost a decade before *Elrod* was decided, the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), considered the application of the First Amendment to a public employee's discharge on facts differing in important respects from those in *Elrod* and *Branti*. *Pickering* concerned an action brought by a teacher against the board of education that had dismissed him. The teacher sought reinstatement. He had been dismissed for sending, apropos of a recently proposed tax increase, a letter to a local newspaper criticizing the school board's handling of past proposals to raise new revenue for the schools. The Court first established a framework for resolving issues of this type:

> "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734–35.

No question of maintaining discipline or harmony among co-workers was presented, the Court found, since the teacher's statements were not directed to any person with whom the teacher would be in daily contact. *Id.* at 569–70, 88 S.Ct. at 1735–36. The Court then applied a balancing test; it first noted that the question whether the school system required additional funds was a matter of legitimate public concern. "On such a question," it stated,

"free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* at 571–72, 88 S.Ct. at 1736.

Statements by public officials on matters of public concern, the Court indicated, must be given First Amendment protection even though the statements are directed at their nominal superiors. *Id.* at 574, 88 S.Ct. at 1737.

The Court affirmed that, speaking generally, the State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of citizenry in general." *Id.* at 568, 88 S.Ct. at 1734. On the particular facts in *Pickering,* however, the Court found that the school board's interests in limiting its teachers' speech opportunities were not significantly greater than its interests in limiting the speech opportunities of the general public, because the facts did not show that the teacher's statements, even if false, impeded his classroom performance or interfered with the regular operation of the schools. *Id.* at 572–73, 88 S.Ct. at 1736–37. The Court therefore found the teacher's dismissal unconstitutional, holding that unless there is proof of false statements knowingly or recklessly made, "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. at 1738.

In *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court considered the application of the *Pickering* balancing test in a case in which the grounds for the public employee's discharge included both conduct constitutionally protected and conduct not constitutionally protected. In that case an untenured teacher brought an action for reinstatement against

his former employer, a school board, claiming that the board's decision not to rehire him violated his rights under the First and Fourteenth Amendments. Prior to the board's decision the teacher had been involved in several incidents relating to his employment, viz., an argument with school cafeteria employees, an incident in which he swore at students, an incident in which he made obscene gestures to female students, and an incident in which he had by a telephone call communicated to a radio station the substance of a memorandum from the school principal relating to teacher dress and appearance. When the teacher sought an explanation for the board's decision not to rehire him, he received a statement citing his "notable lack of tact in handling professional matters," followed by references to the radio station and obscene gesture incidents. The federal district court, concluding that the telephone call was conduct protected by the First Amendment, reasoned that since this protected conduct had played a substantial part in the decision not to rehire the teacher, reinstatement was appropriate. On appeal the Supreme Court accepted the district court's finding that the telephone call was protected by the First and Fourteenth Amendments. It rejected the proposition that, on the facts of the case, a showing that protected conduct played a substantial part in the employment decision would necessarily support a conclusion of constitutional violation justifying remedial action. The Court reasoned that

"[a] rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would

have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct." 429 U.S. at 285, 97 S.Ct. at 575.

In accordance with this reasoning, the Court formulated a rule for allocating the burden of persuasion in cases of this type. Initially, it stated, the burden is properly placed on the plaintiff to show that the "conduct was constitutionally protected, and that this conduct was a 'substantial factor'— or to put it in other words, that it was a 'motivating factor' in the decision" to discharge or not to rehire. *Id.* at 287, 97 S.Ct. at 576. If the plaintiff carries this burden, the employer is then to be accorded the opportunity to show by a preponderance of the evidence that it would have reached the same employment decision even in the absence of the protected conduct. *Id.* If the employer makes this showing, the discharge or decision to not rehire will stand. *See Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Jones v. Dodson*, 727 F.2d 1329 (4th Cir.1984); *Ollman v. Toll*, 518 F.Supp. 1196 (D.Md.1981), *aff'd* 704 F.2d 139 (4th Cir.1983).

The *Mt. Healthy* procedure thus incorporates the *Pickering* balancing test in its first step. The Court has illustrated in two recent cases how this balance is to be struck. In *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), a former assistant district attorney contended that her employment was terminated because of a questionnaire she distributed to other assistant district attorneys in her office. Finding that most of the questions on the questionnaire did not concern matters of public concern, and thus did not trigger constitutional scrutiny, the Court stated:

"When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the

First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." 461 U.S. at 146, 103 S.Ct. at 1690.

With respect to one question that did fall under the rubric of matters of public concern, the Court, although noting that the First Amendment " 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' " 461 U.S. at 145, 103 S.Ct. at 1689 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), struck the balance for the government. It held that given the context in which the questionnaire was distributed, it had great potential to undermine authority and destroy working relationships. This concern, the Court held, outweighed the limited First Amendment interests the questionnaire represented. *Id.* at 154, 103 S.Ct. at 1693.

In *Rankin v. McPherson,* —— U.S. ——, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), by contrast, the Court found for the public employee. In that case a clerical employee in a county constable's office was discharged for a political remark made to a co-employee during a private conversation. The Court, noting that there was no evidence that the statement either interfered with the efficient functioning of the office or had a detrimental effect on the working relationship between the clerical employee and the constable, held that the constable had not met his burden under *Pickering.* 107 S.Ct. at 2899–90.

We first applied the principles set forth in *Pickering* and *Mt. Healthy* in *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 418 A.2d 1191 (1980). There, a county executive shortly after assuming office requested the resignation of DiGrazia, who was the director of the county's police department. According to statements attributed to the county executive at a press conference, he sought DiGra-

zia's resignation because of remarks which DiGrazia made that disparaged the county's police force. When DiGrazia refused to resign, the county executive discharged him. DiGrazia filed a petition in circuit court against the county executive, claiming he had been removed from his position in violation of several sections of the Law Enforcement Officers' Bill of Rights (LEOBR), including a section proscribing discharge of a law enforcement officer for the lawful exercise of a constitutional right. The trial court granted summary judgment for the county executive, finding as a matter of law that DiGrazia had not been removed from office in violation of the LEOBR. We reversed and remanded. After discussing *Mt. Healthy,* we noted that the test formulated in that case is applicable only if the employee first shows that his conduct was constitutionally protected. *Pickering,* we stated, established the balancing test for making this determination. We held that this calculus is a mixed question of law and fact and that on the facts of that case resolution by summary judgment was not appropriate.

In *De Bleecker v. Montgomery County,* 292 Md. 498, 438 A.2d 1348 (1982), we reached a similar conclusion. There, a nontenured temporary teacher had been employed by a county board of education to teach inmates at the county detention center. He brought a civil rights action against the board, the detention center, and others, asserting that he had been discharged from his employment in violation of his First Amendment rights. He alleged that there had been an altercation between inmates at the detention center, which was quelled with unnecessary violence; that he had made statements to the inmates and filed a written report with the center authorities, expressing his disagreement with the violence; and that, as a result of his statements to the inmates and his written report, he had been discharged. At the close of the teacher's evidence, the trial judge granted the directed verdict motions of all the defendants on the grounds that, though the written report was constitutionally protected, the remarks to the inmates were not, and " 'as a matter of law, it is clear from the evidence that

[De Bleecker] would have been discharged for his unprotected conduct [comments to the inmates] even in the absence of the report.'" 292 Md. at 505, 438 A.2d 1348 (quoting from trial judge's ruling).

We again reversed and remanded. Relying on the guidelines set forth in *Pickering* and *Mt. Healthy*, we held that the trial judge erred in holding as a matter of law that the teacher would have been discharged because of his comments to the inmates even absent his written report. The evidence on this point, we noted, was in conflict. The question, therefore, was one for the jury and should not have been resolved on a directed verdict motion.

### (B)

It is readily evident from our review of these cases that the Supreme Court has formulated different constitutional tests or procedures in response to different factual situations. The test enunciated in *Elrod* and *Branti* was responsive to the question whether a discharge for political patronage reasons alone could ever constitute a First Amendment violation. The Court answered in the affirmative, but carved out an exception for policy-making positions. *Pickering* addressed the question of the circumstances under which overt expressive conduct of public employees could be considered by their employers as grounds for discharge and it developed a balancing test. In *Mt. Healthy* the Court considered a set of facts under which both permissible and impermissible motives may have influenced a decision not to rehire a public employee. In response, the Court set forth a procedure for sorting out these mixed motives so that the employee would be in no better and no worse position than if the impermissible motive had played no role in the employment decision. Given this diversity of constitutional tests and procedures, it is readily apparent that the critical first step in any adjudication in the area of public employee discharge is the selection of the correct test or procedure.

*Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984) illustrates this point. The court there considered the claims of two Sheriff's Department employees that they had been discharged in violation of their First Amendment rights. At trial the jury found for both employees. The facts were such that the jury could have found that the employees were discharged for political affiliation alone, for overt speech activities, or for mixed reasons, some related, others unrelated to First Amendment protections. The jury, however, was not clearly instructed on the different constitutional tests that apply to these different fact situations. Noting that "[r]aw patronage discharges of the *Elrod–Branti* type and overt expressive conduct discharges of the *Pickering–Givhan–Connick* type may be justified on different bases that are not necessarily congruent," *id.* at 1335, and further that "mixed motive [discharges] of the *Mt. Healthy* type" involve yet another procedure, *id.,* the court vacated the jury's verdicts and remanded for new trials. The court held that even though special verdicts were involved, it was unclear on what theory or theories the jury's verdicts were grounded and thus it was uncertain whether the jury had properly resolved the dispositive factual issues.

## III

In the present case, it is clear that the trial court applied the *Elrod–Branti* political patronage test in adjudicating O'Leary's claim. That this test was not appropriate is equally clear. Indeed, the *Elrod–Branti* test is a narrow and somewhat rigid one, *see Jones v. Dodson, supra,* 727 F.2d at 1334 n. 6, and is aptly applied only to a set of facts that, as a threshold matter, show political patronage as the sole motive of a discharge. The facts here pointed to no such threshold conclusion. Despite the seeming obfuscation created by proceeding at trial on the erroneous premise that the *Elrod–Branti* test was controlling, it was apparent from the outset that O'Leary was alleging that her overt expressive conduct in challenging Shipley in the election

was considered by Shipley and played a role, if not the sole role, in Shipley's employment decision. The appropriate test, therefore, was either *Pickering* alone or the combined *Pickering—Mt. Healthy* procedure, depending on whether permissible motives were involved in the discharge along with the allegedly impermissible ones. Once evidence was adduced of both permissible and impermissible motives, it became manifest that the *Mt. Healthy* procedure was the proper one.

In accordance with *Mt. Healthy*, it should have first been determined by a *Pickering* balancing test whether O'Leary's remarks during her campaign for Clerk were constitutionally protected. If they were, the court should have determined whether this protected conduct was a substantial factor in Shipley's decision not to reappoint O'Leary. If these issues were resolved in O'Leary's favor, Shipley should have been given the opportunity to show by a preponderance of the evidence that, even absent his consideration of this protected conduct, O'Leary would not have been reappointed. The trial court, however, determined only that Shipley's decision was not motivated *solely* by political patronage considerations. The wrong test having been applied, essential questions remain unresolved, and a new trial must be ordered.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR CARROLL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.

McAULIFFE, J., dissenting, in which ADKINS and BLACKWELL, JJ., join.

McAULIFFE, Judge, dissenting.

I respectfully dissent. The majority grants O'Leary a new trial to permit her to present a theory of recovery never advanced in her pleadings or at any time during the original trial. The result is manifestly unfair and in viola-

tion of the intendment of Maryland Rule 8–131(a) (formerly Rule 885).

O'Leary's complaint for injunctive relief and damages advanced several theories. She alleged that she was a Democrat, Shipley was a Republican, and that Shipley refused to reappoint her in retaliation for her having opposed him in the general election. She alleged that Shipley's action violated a by-law of the Maryland Court Clerks Association, which specified that members of the association should not refuse to employ any individual because of political affiliation. Further, she alleged that in failing to reappoint her, Shipley violated a State constitutional mandate that he confer with the circuit judges of Carroll County before making his decision. Finally, she claimed that Shipley had deprived her of two weeks salary to which she was entitled. At no point in her complaint did she allege or suggest that Shipley's failure to reappoint her was in retaliation for her exercise of free speech. At trial, O'Leary made no claim that her speech on matters of public concern had anything to do with her failure to achieve reappointment. In a very brief opening statement, her attorney said, "Initially we intend to prove by the testimony given today, and any documentation that we might submit, that the sole reason for the failure of the Defendant to reappoint our client, Ms. Diane O'Leary, was a political reason...." In closing argument, her attorney said:

> We feel that ... we have indicated by a preponderance of the evidence that the Plaintiff, Ms. O'Leary, has ... set forth that she was not reappointed solely for only one reason, sole fact to consider, and that is the fact that she declared her candidacy and that she ran against the incumbent, the Defendant, Mr. Shipley.
>
> \*   \*   \*   \*   \*   \*
>
> The evidence of Mr. Shipley so far as any other reason other than a political reason certainly was not corroborated in any way, it was sparse, it was very vague....
>
> \*   \*   \*   \*   \*   \*

[W]e have also established the fact that the sole reason for her separation was due to a political reason. . . .

O'Leary never mentioned *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), or any other case dealing with dismissal of public employees for their speech on matters of public concern. She did not suggest to the trial judge that he should employ the *Pickering* test, or that the burden should be upon Shipley to show that Shipley would have reached the same employment decision even in the absence of protected speech. She did not interpose any objection when the trial judge allocated to her the burden of proving that Shipley failed to reappoint her for purely political reasons. Indeed, she agreed that the burden was properly upon her. The *Pickering* theory of liability was injected into this case for the first time when O'Leary, who had by that time changed attorneys, filed her brief on appeal. Rule 885, which was in effect when this case was briefed and argued, provided that "[t]his Court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the circuit court." Successor Rule 8–131(a) is to the same effect. As we pointed out in *Banks v. State*, 203 Md. 488, 495, 102 A.2d 267 (1954), this rule was adopted to ensure fairness for all parties in a case, and to promote the orderly administration of the law. *See also Medley v. State*, 52 Md.App. 225, 230–31, 448 A.2d 363 (1982). We have said that a petitioner is bound to the theory he elects to pursue at trial. *Kasten Constr. Co. v. Jolles*, 262 Md. 527, 533–34, 278 A.2d 48 (1971). *See also Chertkof v. Dep't of Nat. Resources*, 43 Md.App. 10, 16–18, 402 A.2d 1315 (1979).

The rule rests on a solid foundation. It is manifestly unfair to reverse a trial judge on a ruling he was never allowed to make—on an issue that was never placed before him. It is equally unfair to subject a defendant to successive trials for claims arising out of the same occurrence,

simply because the plaintiff develops a theory she did not have before, or wishes to try a new tactic. And, quite apart from the question of fairness, our court system cannot afford the luxury of granting a new trial to a disappointed litigant who would like to try a different approach.

A plaintiff should be given a full and fair opportunity to present all claims she or he may have against a defendant as a result of the given transaction or occurrence. Our rules of pleading, including those relating to amendment, are deliberately structured to effectuate this purpose. O'Leary was free to present alternative claims, regardless of consistency. Maryland Rule 2–303(c). She did not do so. She was free to seek amendment of her pleadings, argue the *Pickering* theory, or object to the trial judge's failure to allocate the burden of persuasion in a different manner. She did not do so. I would affirm.

ADKINS and BLACKWELL, JJ., join in this dissent.