623 A.2d 696

**Donald L. PRUITT, et al.**

v.

**HOWARD COUNTY SHERIFF'S DEPARTMENT, et al.**

No. 1086, Sept. Term, 1992.

Court of Special Appeals of Maryland.

April 29, 1993.

Certiorari Denied Sept. 15, 1993.

Sharon E. Haynie and Clarke F. Ahlers, Columbia, for appellants.

Mark H. Bowen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Pikesville, for appellees.

Argued before MOYLAN, BLOOM and WENNER, JJ.

BLOOM, Judge.

In this case we are asked to determine whether certain "Nazi-like" comments and behavior of Major Donald Pruitt and Sergeant Dennis Pruitt, officers of the Howard County Sheriff's Department, were protected speech under the First Amendment. We are also asked to consider whether the officers were denied procedural due process and equal protection under the law when their punishment for misconduct resulted in the termination of their employment. We find no error in, and therefore affirm, the judgment of the Circuit Court for Howard County that affirmed the decision of the Sheriff of Howard County to fire appellants for misconduct.

### Factual Background

On 12 April 1990, Major Donald Pruitt and Sergeant Dennis Pruitt each received notification from the Maryland State Police advising them that they were currently under investigation for misconduct as a result of allegations of Nazi-like conduct reported in the Baltimore Sunpapers between 31 March 1990 and 4 April 1990.[1] On 3 August 1990 the Pruitts

---

1. The conduct ranged from parodies of "Hogan's Heroes," including imitations of "Colonel Klink" and "Sergeant Schultz," exaggerated German accents, exaggerated military mannerisms such as the German Hitler hand salute and heel clicks, to the use of terms like *"achtung"* and *"sieg heil."* The alleged conduct, which occurred within the presence of Howard County Sheriff's Department employees and courthouse personnel, was apparently intended solely for amusement.

were each charged with conduct unbecoming [officers], failure to obey an order of a supervisor, and willful disobedience of an order. Pursuant to the Law Enforcement Officers' Bill of Rights (LEOBR), Md.Ann.Code Art. 27, § 727 (1957, 1992 Repl.Vol.), an administrative hearing board was scheduled to convene on 29 October 1990. On 5 October 1990 an amended charging document was served on the Pruitts, adding a fourth charge of conduct unbecoming.

The administrative hearing board, with Sheriff Raymond Kight of Montgomery County presiding, heard testimony from 29 October to 9 November 1990 and ultimately rendered its decision on 12 December 1990. At that time the board found each of the Pruitts guilty of the first charge of conduct unbecoming and not guilty of the other three counts. On 3 December Herbert Stonesifer was replaced by Michael Chiuchiolo as Sheriff of Howard County. During the hearing, Sheriff Stonesifer had testified as an eyewitness to the alleged conduct.

On 3 January 1991 the administrative hearing board conducted an additional hearing to consider the past performance of the Pruitts preliminary to recommending punishment. On 7 January 1991 the board recommended that each of the Pruitts be demoted in rank, fined two hundred dollars, and receive counseling. Sheriff Chiuchiolo, after conducting a show cause hearing to determine whether punishment should not be increased, issued an order on 5 February 1991 terminating the Pruitts' employment effective 6 February 1991.

An appeal to the Circuit Court for Howard County from the Sheriff's decision and a motion to stay were filed, and the case was transferred to the Circuit Court for Anne Arundel County. The motion for stay was denied after a hearing in April 1991, and it is from that order that this appeal was taken.

Appellants present the following questions for our consideration:

1. Did the lower court err when it found that the decision of the hearing board was legal because: a) the Pruitts' behavior was not protected by the free speech guaran-

tees of the First Amendment of the United States Constitution and Md.Ann.Code Art. 27 section 733 (1992); b) the Pruitts were given adequate notice of the charges against them within the meaning of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Md.Ann.Code Art. 27 section 733 (1992); c) singling the Pruitts out from other participants in the conduct did not violate their rights to equal protection under the Fourteenth Amendment of the United States Constitution and Md.Ann.Code Art. 27 section 733 (1992); and d) charges against the Pruitts were timely filed within the requirements of Md.Ann. Code Art. 27 section 730(b) (1992)?

2. Did the lower court err when it found that the order of Sheriff Chiuchiolo was legal because it was within his authority to increase punishment and because it did not implicate the Pruitts' First Amendment rights nor violate their Due Process or Equal Protection rights under the Fourteenth Amendment to the United States Constitution and Md.Ann.Code Art. 27 sections 731(c) and 733 (1992)?

## Protected Speech

It is well established that a state may not discharge an employee if such discharge would infringe the employee's constitutionally protected right of freedom of speech. *Branti v. Finkel,* 445 U.S. 507, 515–16, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Ed. of Township High School Dist.* 205, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents of University of State of N.Y.,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967). The Maryland Legislature has made specific provision for the protection of the constitutional rights of Maryland law enforcement officers:

A law-enforcement officer may not be discharged, disciplined, demoted, or denied promotion, transfer, or reassign-

ment, or otherwise discriminated against in regard to his employment or be threatened with any such treatment, by reason of his exercise of or demand for the rights granted in this subtitle, or by reason of the lawful exercise of his constitutional rights.

Md.Ann.Code Art. 27, § 733 (1957, 1992 Repl.Vol.).

The determination of whether a public employee has been improperly discharged for engaging in protected speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1735. *See also Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Because debate on issues of public concern is imperative to the functioning of the American system of government, the *Pickering* test is designed to ensure that a governmental employer does not chill the public debate essential to this form of governance. *Arvinger v. Mayor of Baltimore*, 862 F.2d 75, 78–79 (4th Cir.1988). With respect to government employees, only speech that is within the scope of the First Amendment and addresses a matter of public concern is entitled to constitutional protection. *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986).

When an expression does not relate to "any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. Thus if the expression "cannot be fairly characterized as constituting speech on a matter of public

concern, it is unnecessary for us to scrutinize the reasons for ... discharge." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690. If we do not find the speech to concern public issues, we do not reach the balancing test.

■ As pointed out by Justice Marshall in *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987), *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987), the threshold question for determining whether a dismissal is appropriate is whether the speech was "on a matter of public concern." "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."[2] *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690.

The Maryland Court of Appeals first applied this analysis in *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 418 A.2d 1191 (1980), where the Court concluded that the test formulated in *Pickering* was applicable only if the employee demonstrated that his conduct was constitutionally protected. In *De Bleeker v. Montgomery Co.,* 292 Md. 498, 438 A.2d 1348 (1982), the Court of Appeals concluded that the evidence establishing that the employee had been dismissed because of his constitutionally protected conduct was in conflict and, therefore, summary judgment was inappropriate. The application of the *Pickering* balancing test, which requires a determination of whether the alleged conduct was constitutionally protected, was later refined in *O'Leary v. Shipley,* 313 Md. 189, 545 A.2d 17 (1988).

■ In our analysis of the competing claims for First Amendment protection and the need for an orderly administration of the Sheriff's Department, we shall examine the

---

**2.** In a footnote to the *Connick* opinion the Supreme Court noted that the standard for determining whether an expression is of legitimate concern to the public is the same as that for determining the presence of a common law tort action for invasion of privacy. *Connick,* 461 U.S. at 143 n. 5, 103 S.Ct. at 1688 n. 5, citing Restatement (Second) of Torts § 652D (1977), *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), and *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967).

nature of the Pruitts' statements and actions. Like *Berger v. Battaglia,* 779 F.2d 992 (4th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986), in which a Baltimore City police officer was ordered to stop performing Al Jolson songs in black-face, this case does not fit within the traditional employee speech pattern—*i.e.,* cases where the employee criticizes the employer's policy, actions, or supervision. *Berger,* 779 F.2d at 997. Although the Pruitts did not criticize the Sheriff's department, they did imitate or parody "Hogan's Heroes" while in uniform. Thus, "the employee speech was not criticism of or disagreement with governmental operations" but did affect the department's internal operation and public image. The State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734.

In *Hawkins v. Department of Public Safety & Correctional Services,* 325 Md. 621, 602 A.2d 712 (1992), the Court of Appeals held that dismissal of a prison guard for his use of ethnic epithets was reasonable based on the State's apprehension of disruption and possible violence at the correctional institution. After an incident in which the bank refused to cash the guard's payroll check the guard stated to the head cashier, "Hitler should have gotten rid of all you Jews" and later continued, "and all the Poles too." The Court concluded that the speech was personal and not one concerning public issues:

> Clearly, Hawkins [the guard] was not attempting to stimulate a dialogue on the Holocaust. He was giving vent to his anger, and, relying on his fallible ability to identify persons of Jewish heritage, he used speech as a weapon to abuse the teller who had inconvenienced him.... No balancing is required because the threshold requirement of speech on a matter of public concern has not been met.

*Hawkins,* 325 Md. at 633, 602 A.2d 712.

Upon review of the Pruitts' actions in light of their content, form, and context, we are compelled to conclude that

such conduct is not speech on a matter of public concern. The Pruitts testified at the administrative hearing that their conduct was humorous in nature and intended as a joke—as a parody of Hogan's Heroes. Appellants' speech did not, by their own admission, contain any allegations of wrongdoing or present issues of public concern to the community. Instead, it was intended for amusement, bereft of any political content. In contrast to instances where the courts have found that the speech concerned public issues, this case concerns actions and statements not intended to provoke debate or made in reference to a public issue of the time. *Compare Rankin*, 483 U.S. at 381, 107 S.Ct. at 2895 (employee commenting on an attempt to assassinate President Reagan).

In this case, the speech itself was made to other Sheriff department employees and employees of the Howard County courthouse. It was intended as a joke rather than a social commentary. The conduct occurred in a "private setting"— generally away from the public view—a fact that supports our conclusion that the speech is private. *Compare Berger*, 779 F.2d at 999 (concluding that because the black-face performances were made to the public and admission was sometimes paid the performances "constituted speech upon a matter of obvious public interest to those considerable segments of the community who willingly attended").[3] Here the speech and conduct remain unprotected because they did not concern a matter of public interest but instead indicated a personal bias. As the Supreme Court noted in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942), citing *Cantwell v. Connecticut*, 310 U.S. 296, 309–10, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940):

> Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution. . . .

---

**3.** We distinguish *Berger* from the instant case on the grounds that although both cases involved racism the context and form are substantially different. A performance for which an admission price is paid differs in kind and magnitude from a parody acted out for the benefit of co-workers and court personnel.

Because we find that the Pruitts' speech did not concern a matter of public issue we do not reach the second prong of the analysis; we need not balance protected speech against the Sheriff's department's interest in protecting its credibility.

### Adequate Notice

Appellants contend that the trial court erred in finding that the Pruitts were given adequate notice of the charges against them within the meaning of the Due Process Clause. They further allege that Sheriff Stonesifer's testimony that appellants' Nazi-like conduct constituted behavior unbecoming an officer supported the first charge; Sheriff Stonesifer later stated that this same conduct constituted a failure to obey an order, thereby supporting the second and third charges. In our view Sheriff Stonesifer's apparent confusion does not constitute a lack of notice under the procedural due process requirements.

Under the Law Enforcement Officers' Bill Of Rights (LEOBR), any law enforcement agency contemplating punitive action against an officer "shall give notice to the law enforcement officer ... [of] the issues involved." Md.Ann.Code Art. 27, § 730(a) (1957, 1992 Repl.Vol.). In *Reed v. Mayor and City Council of Baltimore*, 323 Md. 175, 184, 592 A.2d 173 (1991), the Court of Appeals stated that the purpose of the notice requirement is to "apprise the officer of the charges warranting disciplinary action in sufficient detail to enable the officer to marshal evidence and arguments in defense of the assertions."

In the instant case both appellants were served with a departmental charging document and departmental findings of fact, the first paragraph of which states:

During the course of your employment with the Howard County Sheriff's Department, you have engaged in a course of conduct by exhibiting Nazi-like behavior and uttering certain german words and phrases, throughout the courthouse complex within view of the public, that has been inappropriate, unbecoming and reflects unfavorably on the department. This conduct has continued even though it has

> been brought to your attention that it was offensive and irritating to fellow employees. Additionally, you were ordered on at least two occasions, to [sic] once by Ex–Sheriff Donnelly during her term of office and once by current Sheriff Stonesifer, approximately two years ago, to discontinue the Nazi behavior in the workplace. This order by a superior officer was disobeyed.

On 5 October 1990 an amended charging document and departmental findings of fact, essentially the same in substance, were served on the Pruitts. In addition to the findings stated above the amended findings also included:

> By misusing the authority of your position, you have also engaged in a course of conduct that has adversely effected [sic] the morale of the department and undermined the good order, efficiency and discipline of the department.

Appellants claim that this Court must necessarily find that "where there exists a disagreement in the meaning of a charge between the charging supervisor and a prosecutor at a point later in time" the meaning of the charges must be explained prior to the hearing to meet the due process requirement. We believe that appellants have misconstrued the meaning of due process under the case law.

We distinguish *Reed* from the case at bar based upon the nature of the charges. In *Reed* the police officer was charged with "reflect[ing] discredit upon the Baltimore Police Department and/or herself as a member thereof." This charge failed to indicate what actions comprised either the incident or the conduct reflecting discredit upon the department. In the instant case appellants were each charged with conduct specifically identified as "Nazi-like behavior" including the use of German words and phrases. In the second and third charges appellants were charged with failing to comply with a superior's order instructing them to stop this behavior. Finally the fourth charge centered on appellant's misuse of their position while engaged in this conduct, adversely affecting the efficiency, moral order, and discipline of the Sheriff's department. Based upon these charges, the Hearing Board found appellants guilty of conduct unbecoming (charge one) based upon

appellants' demonstrated Nazi-like conduct. We believe that appellants were provided with the factual basis for the charges and therefore given sufficient notice to enable them to "marshal evidence and arguments in defense of the assertions."

### Equal Protection

■ Appellants also contend that their rights to equal protection under the law were abridged because other Sheriff's department employees who engaged in similar Nazi-like conduct were not also charged with this offense. The record does not support appellants' contention that other employees were in a situation approximate to appellants'. We also note that the decision to charge only appellants with this offense meets the rational basis test. Appellants raised the equal protection argument before Judge Lerner, who ruled that a rational basis existed for the disparate treatment.[4]

■ The Court of Appeals recently reviewed the prevailing interpretations of the equal protection clause in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992). A classification that burdens a suspect class or impinges upon a fundamental right receives strict scrutiny; a classification that burdens a quasi-suspect class or impinges upon important personal rights receives heightened or intermediate scrutiny; and a classification that does not involve either a suspect or quasi-suspect class and does not infringe any fundamental or important personal right must receive scrutiny under the rational basis test. *Murphy*, 325 Md. at 356–58, 601 A.2d 102.

There is, of course, no need to engage in the strict scrutiny/heightened scrutiny/rational basis analysis unless there is a

---

**4.** Judge Lerner declined to find that appellants' First Amendment rights had been violated and accordingly refused to give this allegation the higher level of scrutiny afforded to fundamental rights. Although mere failure to prosecute other offenders is no basis for a finding of a denial of equal protection, selective prosecution may not be based upon clearly impermissible discriminatory grounds such as race, religion, or the exercise of First Amendment rights to free speech. *United States v. Blitstein*, 626 F.2d 774, 782 (10th Cir.), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1980).

showing that similarly situated individuals received disparate treatment. Appellants cannot succeed on their equal protection claim unless they can show that other, similarly situated individuals did not receive the same treatment, *i.e.*, they were not subject to like punishment for like behavior. Appellants have not met this threshold requirement. The evidence presented to the hearing board shows that no other employee of the Howard County Sheriff's department engaged in the alleged Nazi-like activity to the same degree as appellants. The evidence also shows that the Pruitts were the second and third highest ranking officers of the department and thus were in substantially different positions than the remainder of departmental employees. Donald Pruitt served as Chief Deputy and supervised all elements of the department, handled complaints and implemented the orders of the Sheriff. Dennis Pruitt served as Sergeant and as departmental internal affairs officer as well as supervised the deputies assigned to road work.

The evidence presented included testimony by eleven witnesses that they had never observed anyone other than appellants engaging in Nazi-like conduct. Several deputies testified that they had on occasion observed other deputies return a Nazi salute to the Pruitts. The testimony showed that appellants had engaged in this conduct on a daily basis for a period of ten years.

Appellants rely upon *Zeigler v. Jackson*, 638 F.2d 776 (5th Cir.1981), to support their contention that the disparate treatment of the Pruitts was not related to the objectives of the regulations under which they were charged. In *Zeigler* a police officer was terminated from employment based upon a prior criminal conviction while three other police officers similarly situated were retained. In reaching its decision the court stated:

We agree with the district court that the equal protection clause does not require that all persons be treated identically. However, if distinctions between similarly situated individuals are to withstand equal protection analysis, such distinctions must be reasonable, not arbitrary, and must

rest on grounds having a fair and substantial relation to the object of the legislation.

*Zeigler*, 638 F.2d at 779. Because the police commission failed to show a rational justification for the disparate treatment the court concluded that the termination of Zeigler's employment violated his right to equal protection under the law.

We distinguish *Zeigler* from the instant case based upon the facts. The evidence does not show that any other members of the department were similarly situated to appellants. No other employees were engaged in Nazi-like conduct with the frequency and duration that the Pruitts engaged in it; the Pruitts, unlike the others, were high ranking officers charged with the supervision of other deputies.

Under the rational basis test we also find no violation of the Pruitts' rights to equal protection. The rational basis test requires that a classification be declared unconstitutional only if the "varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational." *Murphy*, 325 Md. at 355, 601 A.2d 102 quoting *Gregory v. Ashcroft*, —— U.S. ——, ——, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410, 430 (1991). Based upon the weight of the evidence concerning the frequency and duration of the Pruitts' activities, and in light of the Department's legitimate interest in bringing disciplinary actions against officers who violate regulations, we find no violation of appellants' right to equal protection under the law.

### Timeliness of Charges

Appellants argue that the charges filed on 8 August 1990, and amended on 5 October 1990, were filed after the one year limitations period codified in Article 27, Section 730(b)(1), which provides in pertinent part:

Administrative charges may not be brought against a law enforcement officer unless filed within 1 year after the act that gives rise to the charges comes to the attention of the appropriate law enforcement agency official.

Appellants further contend that within the meaning of the statute the appropriate law enforcement agency official, Sheriff Stonesifer, "knew, or should have known, of the course of conduct no later than February of 1988."

A review of the facts leads us to conclude that the record supports Sheriff Stonesifer's testimony that he did not become aware of the recurring conduct until March 1990. Sheriff Stonesifer testified that the first time he observed the Nazi conduct was in March of 1990 when he saw Dennis Pruitt give a salute, *i.e.* "threw his arm up." Stonesifer indicated that Donald Pruitt, on another occasion, had come into the Sheriff's office, clicked his heels, and addressed the Sheriff as "Herr Major," but that Stonesifer did not ascribe any significance to the event at that time.

Sheriff Stonesifer had earlier received a complaint about the Nazi conduct in 1988, at which time he directed Donald Pruitt to stop engaging in that behavior. Stonesifer testified that he received no further complaints until approached by a newspaper reporter in March 1990. Appellants argue that Stonesifer first became aware of the conduct in 1988, causing the statute of limitations to run. When the Sheriff first received a complaint in 1988, he ordered Donald Pruitt to cease his Nazi-like behavior at that time, which, we believe, was an appropriate disposition of what seemed to be an isolated incident. Upon learning that his order had been disobeyed and that the conduct continued, Stonesifer initiated an investigation that resulted in the filing of charges against appellants in August of 1990, a little less than five months after the recurring misconduct was brought to the attention of Sheriff Stonesifer. Because Sheriff Stonesifer had no knowledge of the continuing nature of appellants' acts, the statute of limitations did not begin to run until their conduct was brought to his attention. Whether Sheriff Stonesifer had a duty to use due diligence to discover this conduct is not properly before us; Sheriff Stonesifer testified that he had no knowledge of and received no complaints of misconduct until March 1990. Based on those facts, we find that the charges were timely filed within the one year limitation.

*Authority to Increase Punishment*

Appellant argues that because Sheriff Stonesifer was an eyewitness to appellants' misconduct under Article 27, Section 731(d)(1)(i), the new chief, Sheriff Chiuchiolo, is bound by the hearing board's recommendation to Sheriff Stonesifer. We agree with the trial judge's interpretation of Section 731(d) as precluding a chief who was personally involved in an incident from exercising any authority over the punishment instated. This construction ensures that the disciplinary proceeding is not tainted by unfair prejudice or bias.

Section 731(d)(1) provides in pertinent part:

Notwithstanding any other provisions of this subtitle, the decision of the hearing board, both as to findings of fact and punishment, if any, is final:

(i) if a chief is an eyewitness to the incident under investigation. . . .

Under the facts of this case the chief vested with the authority to change the recommended punishment is not the chief who was an eyewitness to the incident. We agree that in cases in which a new chief takes office during the disciplinary process there is no rational basis for confining his or her authority to alter the board recommended policy. Because Sheriff Chiuchiolo was not an eyewitness to this event, the written recommendations of the board were not binding on him. In order to increase this recommendation, the Sheriff must personally review the entire record of the hearings board proceedings, permit the law enforcement officer to be heard, and state the reason for increasing the recommended penalty. Md.Ann. Code, Art. 27, § 731(c). Sheriff Chiuchiolo complied with these requirements by reviewing the record, conducting a show cause hearing, and indicating that he was increasing the penalty because of his concerns about integrating the Pruitts into the work place, respect for them by their subordinates, and whether they would fit into his management scheme for the department. Because the Law Enforcement Officers' Bill of Rights does not preclude a chief from dismissing an officer notwithstanding a recommendation by the hearing board for a lesser punishment, *Police Comm'r v. Dowling,* 281 Md. 412,

379 A.2d 1007 (1977), we find no error in the circuit court's affirmance of Sheriff Chiuchiolo's decision to exercise his authority to increase punishment and terminate the Pruitts' employment with the Sheriff's department.

*Increase in Punishment was not Violative of Due Process*

 Appellants contend that their procedural due process rights were violated by Sheriff Chiuchiolo's demonstrated bias against them and his predetermined decision to increase their penalty. We find no support for that contention in the record and accordingly affirm the circuit court's decision to affirm the increase in punishment.

Appellants rely upon case law that holds that fact-finders, in determining guilt or innocence, must be impartial. The cases they cite, however, do not require individuals who impose penalties to be impartial. While the code attempts to protect the officer from unfairness by precluding a chief who was part of the incident from altering the recommendations of the hearing board, it does not require that the chief who imposes the penalty have no opinion or previous knowledge of the case. In *Hortonville Joint School District No. 1 v. Hortonville Ed. Ass'n*, 426 U.S. 482, 493, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), the Supreme Court explained:

> Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify the decisionmaker. Nor is a decision-maker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not "capable of judging a particular controversy fairly on the basis of its own circumstances." (Citations omitted.)

*See also Hoyt v. Police Com'r of Baltimore City*, 279 Md. 74, 86–88, 367 A.2d 924 (1977). Furthermore, the cases relied upon by appellants required a demonstrated bias of a personal or financial stake in the decision, or some personal bitterness regarding the subject of the decision. *See e.g., Hortonville, supra.* In this case there has been no evidence of bias rising to that level.

██ Appellants offered three affidavits to show that Sheriff Chiuchiolo was biased against them. Appellant Donald Pruitt stated that Chiuchiolo had discussed the charges with Rabbi Siegel during his election campaign, and had stated that he would deal with the charges against the Pruitts if the hearing board did not. Charles J. Sikorsky, Jr., stated that he heard Sheriff-elect Chiuchiolo state, at a Christmas party, that Stonesifer should have fired appellants and that he intended to do so. Michael Marshall, appellants' counsel, stated that Chiuchiolo had indicated that he had discussed the case with the investigator and had talked to members of the community who felt appellants should be terminated.

These affidavits do not reveal a personal or financial interest in the case or any bitterness towards appellants. Sheriff Chiuchiolo's opinion of the situation does not constitute bias—he discussed this issue as a candidate running for the office of Sheriff and in social situations. Generally there is a presumption of honesty and integrity in policy makers with decision making power. *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Chiuchiolo's statements indicate that he regarded the allegations about appellants' conduct to be of major importance to the Sheriff's office and that he intended to deal with the matter promptly if the hearing board did not. His comments did not clearly reveal a disqualifying bias or personal bitterness against appellants.

### Summary

We hold that appellants' Nazi-like conduct did not concern public issues and therefore does not warrant First Amendment protection, that the charges of misconduct against appellants were timely and gave adequate notice of the issues, that appellants' rights to equal protection of the law were not violated, and that Sheriff Chiuchiolo acted within his authority and discretion in terminating appellants' employment. Accordingly, we affirm the judgment of the circuit court.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.