## L.M.T. STEEL PRODUCTS, INC. *v.* DORIS K. PEIRSON ET AL.

[No. 648, September Term, 1980.]

*Decided February 6, 1981.*

634

The cause was argued before GILBERT, C. J., and WILNER, J., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), specially assigned.

*E. Gwinn Miller,* with whom was *Robert W. Fox* on the brief, for appellant.

*Phillips L. Goldsborough, III,* with whom were *Smith, Somerville & Case* on the brief, for appellees Ham and Jones.

WILNER, J., delivered the opinion of the Court.

On September 18, 1975, Roy Webster was involved in an automobile accident from which Doris Peirson suffered substantial injuries. Mrs. Peirson and her husband sued Webster and others in the Circuit Court for Harford County and recovered a rather large verdict. One of the defendants sued was appellant, who was alleged by the plaintiffs and believed by the jury to be Webster's employer at the time of the accident. Its liability was strictly a vicarious one, emanating from the doctrine of *respondeat superior.*

Appellant's contention is a three-fold one which derives in large measure from the fact that Webster was driving his own vehicle at the time of the accident. It argues that: (1) Webster was an independent contractor and not appellant's employee, this being evident from the overall relationship between the parties; (2) even if Webster was an employee, he was not acting within the course of his employment at the time of the accident; and (3) even if Webster was then acting in the course of his employment, appellant is not liable because it never expressly consented to Webster's use of his personal vehicle in performing his duties for appellant. These arguments are made in the context of appellant's complaint that the court erred in denying its motions for directed verdict and for judgment N.O.V., and in denying as well

certain requested instructions to the jury (Nos. 27-30) regarding its vicarious liability. We find no error and shall affirm.

### (1) Overall Relationship — Employee or Independent Contractor?

The rules which define the distinction between the relationship of employer-employee and that of independent contractors — which tell us, in other words, when a person is an employee/servant and not an independent contractor — are fairly well settled. As pointed out in *B.P. Oil Corp. v. Mabe,* 279 Md. 632 (1977), there were originally four elements to be considered in determining the existence of the master-servant relationship, these being "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power of dismissal, and (4) the power of control of the servant's conduct." *Sun Cab Co. v. Powell,* 196 Md. 572, 577-78 (1951), quoted in *Mabe,* 279 Md. at 638. In *Keitz v. National Paving and Contracting Co.,* 214 Md. 479, 491 (1957), the Court added a fifth element to be considered — "whether the work is a part of the regular business of the employer."

As the Court was careful to point out in *Keitz,* however, and in nearly every case involving this issue decided since *Keitz (see, for example, Mabe* at 638), these are but *indicia* of the employment relationship — factors or criteria to look at. Only one of the five has any special conclusive significance; that is element four, the power or right to control, with some immediacy and directness, the alleged servant's work. If that *right* of control is present, the relationship is necessarily one of employment, because it negates the independence or autonomy presumed to exist with an independent contractor. As stated in *Keitz* at 491 and repeated in *Mabe* at 638:

> "The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the*

> *servant in the performance of his work and in the manner in which the work is to be done. . . .* [I]t is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important." (Emphasis in original.)

To some extent, of course, the right of overall control is implicit in all five elements, which is why they are all relevant. The power of dismissal, for example, certainly carries with it the power to control in some measure how the subordinate does his work. The distinction, it would seem, is in the degree to which the power of control, if it exists, is exercised. To have an employment relationship, the "employer" must have some ability, should he care to exercise it, to tell the "employee" what to do and how and when to do it. If there is not this minimal power of control — if the worker's agreement is to perform the work "according to his own means and methods free from control of his employer in all details connected with the performance of the work except as to its product or result" — the worker is deemed to be an independent contractor and not an employee/servant. *Williams Construction Co. v. Bohlen,* 189 Md. 576, 580 (1948); *Gale v. Greater Washington Softball Umpires Assoc.,* 19 Md. App. 481 (1973).

A master-servant relationship does not require, however, the actual exercise of minutely or hourly or even daily direct on-site supervision by the employer. Indeed, the more authority an employee has, the less likely such routine supervision will be. The president or vice-president of a company is not likely to be supervised by the board of directors in his every action, but that does not render him less an employee; it does not make him an independent contractor. To one degree or another, this is necessarily true with respect to all persons employed in administrative or supervisory roles.

What the Court seemed to be saying in *Keitz,* and in previous and subsequent cases, is that if the *exercise* of direct and

immediate supervision is present, there is little need to look beyond it. That will suffice to label the relationship one of employment. But direct and immediate supervision is not the exclusive test; it is not a *sine qua non*. If it does not exist, the court must still look to see whether the *right* or *power* of control is present, which then involves an examination of the other four factors, and perhaps others that might also be relevant to the particular circumstance. This is the *legal* framework within which we must consider appellant's contention.

The *evidentiary* framework governing our review is that restated for us recently in *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 328 (1978). In judging the propriety of a motion for directed verdict (or for judgment N.O.V.), the trial court, and on review this Court, must consider the evidence in a light most favorable to the party against whom the motion is made — in this case the appellees. All conflicts must be resolved and all reasonable inferences must be drawn in their favor.

We may start with a few basic facts that are not in dispute. Appellant is a New Jersey corporation that had been awarded a subcontract on a school construction project in Harford County. It was to supply and install the interior partitions in the North Harford school. Webster had been selected by appellant to superintend the installation.

The only evidence pertaining to the nature of Webster's relationship with appellant came from Webster, and it was not without some internal contradiction. Several times he identified himself as an employee of appellant. When asked, for example, by whom he was "employed," he answered, "L.M.T. Steel Products" — appellant. He considered himself appellant's "foreman" on the job.

Webster said that he had worked for appellant, on and off, since 1964. He had no written contract. On some jobs he was paid by the hour, on others by the week, and on still others by the "foot" — *i.e.,* so much for each linear foot of partition erected. Appellant determined the method of compensation for each job. On this job, Webster was being paid by the foot.

Webster stated that the method of compensation had no effect on his duties, the way in which he performed his work.[1]

Webster was not directly supervised on the job. He was given a set of blueprints and he (and the men he hired) installed the partitions supplied by appellant. He hired and supervised the other installers and set their wages, but they were appellant's employees and were paid with checks drawn on appellant's payroll account. Webster was authorized to sign the payroll checks on behalf of appellant and did so. A special account was established by appellant in a New Jersey bank for that purpose. Webster also drew a weekly check on that account for his own compensation, to an unincorporated company he had "registered" — a company known as "VIP" — but gave no explanation for that procedure. No ordinary payroll deductions were made on his checks. Webster never acquired a contractor's license in Maryland, either in his name or that of any company.[2] He acknowledged that he could be "terminated" by appellant if it didn't like the way in which he did his work.

Some aspects of the relationship, as Webster described it, would be consistent with a finding that he was an independent contractor; but most aspects support the conclusion that he was a supervisory employee for appellant — the general foreman on the job. The evidence most favorable to appellees would clearly establish at least four of the five criteria or elements mentioned in *Keitz;* only the exercise (but not necessarily the power) of direct supervisory control is lacking. But given the nature of Webster's duties — overall jobsite responsibility — that is, as we have said, by no means fatal. At the very least, it was a proper issue for the jury to resolve.

---

1. Webster had, from time to time, done work on an independent contracting basis under the name of Cyclone Steel, Incorporated. He did not use that corporation in this job, however.

2. See Md. Ann. Code art. 56, § 180.

### (2) Was Webster in the Course of his Employ-
### ment at the Time of the Accident?

Webster testified that, at the time of the accident, he was on his way from the jobsite to a diner to use a public telephone in order to call appellant's home office on a job-related matter. He indicated at one point that the call, which ultimately was made, may have been to relay information necessary for preparation of the weekly payroll for appellant's employees on the job. The accident occurred on a Thursday, and the evidence suggested that the workers were to be paid the next day. Webster said that, although there was a telephone at the jobsite, it was in use with several people waiting, and for that reason he drove the seven miles to what he thought was the next nearest public telephone.

None of this was contradicted by other evidence, and it would clearly suffice to show that Webster was in the course and scope of his employment — in furtherance of appellant's business — when driving to the diner.

### (3) Appellant's Consent to Webster's Use
### of His Personal Vehicle

The question of whether, and under what circumstances, an employer is vicariously liable for injuries arising from accidents caused by an employee while driving his own vehicle is not new in Maryland. It seems to have been first considered in *Goldsmith v. Chesebrough,* 138 Md. 1 (1921), where the Court acquitted the employer of any responsibility.

Though not clearly articulated until several years later in *Henkelmann v. Metropolitan Life Insurance Co.,* 180 Md. 591 (1942), one basic principle applied in *Goldsmith* and in the intervening cases of *Regal Laundry Co., Inc. v. A. S. Abell Co.,* 163 Md. 525 (1933) and *Great Atlantic & Pacific Tea Co. v. Noppenberger,* 171 Md. 378 (1937) is that, in such a situation the Court must look beyond the general employment (master-servant) relationship from which vicarious liability generally arises. Even assuming that the culpable

actor was an employee and that he was, at the time of the incident, engaged in his employment duties, it seems clear that, at the very least, the Court must nevertheless examine whether the particular instrument used by him to carry out those duties — to wit, the employee's personal automobile — was approved or consented to by the employer. A question left somewhat open by the cases is the degree to which the employer must also have the right to control the manner in which that personal vehicle is used by the employee.

In *Goldsmith* and in *Henkelmann,* the employee was a salesman/collector on his way, in his own vehicle, to his assigned "territory" when the accident occurred. A car was not necessary to the performance of his duties and the employer had never consented to or authorized the use of a personal vehicle either to travel to or from the assigned territory or while working within it. In *Goldsmith,* the Court stated the applicable rule thusly, quoting from *Labatt's Master and Servant,* 2d ed., p. 6888 *(see* 138 Md. at 8):

> " 'If the other circumstances involved in a case are consistent with, or require, the inference that the tort complained of was within the scope of the servant's employment, the mere fact that the instrumentality which occasioned the plaintiff's injury did not belong to the master will not preclude him from recovering damages. The action is deemed to be *maintainable* or *not maintainable,* according as his use of the instrumentality *was* or *was not authorized,* expressly or impliedly, by the master.' " (Emphasis in original.)

The relevant criterion stated in *Goldsmith* was authorization; nothing was said about controlling the use of the vehicle. In *Noppenberger* the Court broadened a bit the nature of the requisite express or implied consent. Omitting citations, the Court said at pp. 391-92 of 171 Md.:

> "The servant may also act within the scope of his employment in using an instrumentality not expressly authorized to effect a result which he has

been ordered by the master to accomplish, where
the means to be used are not specified . . . and no
other means of obeying the order are available. . . .
For, if 'the master directs a servant to accomplish
the result and does not specify the means to be used,
the servant is authorized to employ any usual or
suitable means' . . . . *And the authority to use the
instrumentality may be implied from the
necessity.*" (Emphasis supplied.)

*Henkelmann* coalesced these principles, but introduced
some rather broad language about controlling the use of the
vehicle. At p. 599 of 180 Md., the Court observed:

"It is now held by the great weight of authority that
a master will not be held responsible for negligent
operation of a servant's automobile, even though
engaged at the time in furthering the master's busi-
ness unless the master expressly or impliedly
consents to the use of the automobile, *and that [sic,
he] had the right to control the servant in its oper-
ation,* or else the use of the automobile was of such
vital importance in furthering the master's busi-
ness that his control over it might reasonably in
[*sic,* be] inferred." (Emphasis supplied.)

The actual tortfeasor in *Henkelmann* was an insurance
agent whose function was to sell "industrial" insurance
policies and to collect premiums on his debit in certain
assigned areas; and, in judging the liability of his prin-
cipal/employer — the insurance company — the Court
became enmeshed in the subtle distinctions and similarities
between the principal/agent relationship, on the one hand,
and the master-servant relationship on the other. It was in
that context that the Court went on to say, at 601:

"Of course, even an agent may be subject to the
control of his principal in respect to some portion of
the work to be performed, and under such circum-
stances the doctrine of *respondeat superior* can be
invoked. But it has been distinctly held that the

doctrine applies in such a case only when the relationship of master and servant existed in respect to the very thing from which the injury arose. . . . We accept the principle adopted by the great weight of authority that an insurance company is not liable for an agent's negligent operation of an automobile, where the company has no control over the method and means adopted by the agent in the performance of the work, but is interested only in the results accomplished." (Citation omitted.)

Also relevant here is *Regal Laundry Co. v. Abell Co.,* *supra,* 163 Md. 525. The tortfeasor there was a newspaper reporter assigned generally to cover a political campaign. This required him to follow the candidates around and attend meetings and events in different parts of the State; and, with his editor's knowledge, he used his own car as transportation, for which the newspaper reimbursed him. The accident in question occurred while the reporter was en route from a political event in Salisbury, which he covered for the newspaper, to his office in Baltimore, where he was to receive further assignments. Relying almost entirely upon the principles announced in *Goldsmith,* the Court reversed a directed verdict in favor of the newspaper. The fact that the employer knew the reporter was using his automobile in carrying out his assignments and agreed to reimburse him for that use sufficed to establish an implied authorization even though there was no evidence that the newspaper had or purported to exercise any control over the details and manner of the reporter's transportation in general or his driving in particular. *See also Maryland Casualty Co. v. Sause,* 190 Md. 135 (1948).

None of these cases are directly on point; each has an element or two not present here. But they do seem to support the conclusion reached by Judge Chesnut in *Paly v. United States,* 125 F. Supp. 798, 806 (D. Md. 1954), *aff'd* 221 F.2d 958 (4th Cir. 1955), that "[t]he principle that is applied throughout is whether on the particular facts the employee

was authorized by the employer, either expressly or impliedly, to use his automobile in the performance of his duties," rather than the characterization of *Henkelmann* by Judge Sobeloff in *Cooner v. United States,* 276 F.2d 220, 227 (4th Cir. 1960), as suggesting that the master have "the right to control the details and manner of the servant's driving" in order to assume vicarious liability. *See in general* Annot., *Employee Driving Own Car — Liability,* 52 ALR2d 287.

*Henkelmann,* it is true, can be read in the manner Judge Sobeloff suggested; but where the underlying relationship is one of master-servant and not something less (such as independent contractor, principal/agent, or some hybrid), we do not believe that the Court of Appeals intended such a stringent rule to prevail. That would serve to ignore the concepts announced and applied in *Noppenberger* and *Regal Laundry* and to mandate a degree of particularized control not required with respect to any other type or aspect of vicarious liability emanating from the employment relationship. If the employer has, expressly or impliedly, authorized the employee to use his personal vehicle in the execution of his duties, and the employee is in fact engaged in such endeavors at the time of the incident, that ought to suffice. Whatever theory may be used to support the underlying doctrine of *respondeat superior,*[3] it would not be offended by that principle.

Upon this basis, we think that the evidence did suffice to show at least an implied authorization by appellant to use his personal vehicle in the pursuit of his duties. Webster had plenary responsibility for seeing to the installation of the partitions, and appellant was aware not only that a vehicle might be required in order to carry out that responsibility but that Webster would be using his vehicle (as he had in the past) for that purpose. From their past dealings, if not from necessity, authorization may be inferred.

---

**3.** *See Henkelmann* at 598-99 of 180 Md., where the Court iterated a number of theories previously espoused to support the doctrine.

## (4) Jury Instructions

Our analysis of the evidentiary issue also controls the resolution of appellant's complaints about the denial of its four requested jury instructions. Some of the requests were fairly covered by the court's actual charge to the jury; others were either not correct expressions of the law, given the circumstances of this case, or amounted to abstract principles of law for which no instruction was required. The court, in any event, correctly instructed the jury as to the criteria it was to consider in determining the nature of Webster's relationship to appellant; and we therefore find no error.

*Judgment affirmed; appellant to pay the costs.*