642 A.2d 245

Anna CONNORS, et al.

v.

Willie James OAKS, et al.

No. 1237, Sept. Term, 1993.

Court of Special Appeals of Maryland.

June 6, 1994.

526

528

Phillips P. O'Shaughnessy, Baltimore (Joseph A. Miklasz and Richard J. Gregson, on the brief), Glen Burnie, for appellants.

Paul D. Bekman, Daniel M. Clements, Scott R. Scherr and Israelson, Salsbury, Clements & Bekman, Baltimore, for amicus curiae, Maryland Trial Lawyers Ass'n.

Margaret Fonshell Ward (William J. Jackson, P.C. and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee, Oaks.

Charles E. Gallagher, Jr. (Neil J. MacDonald and DeCaro, Doran, Siciliano, Gallagher, Sonntag & DeBlasis, on the brief), Lanham, for appellee Giant Food Inc.

Sidney S. Campen, Jr. and Campen & Walsworth, P.A., Easton, on the brief, for appellee, State.

Argued before MOYLAN, ALPERT and WENNER, JJ.

WENNER, Judge.

Appellant, Anna Connors, was injured on 5 July 1989 when the van in which she was riding was struck by a car driven by appellee, Willie James Oaks (Oaks). Oaks lost control of his car due to a combination of his excessive speed and an inordinate amount of water that had accumulated on the roadway following a heavy rain. Anna Connors and her husband, Herbert Connors, who is an invalid, filed a complaint in the Circuit Court for Anne Arundel County against Oaks; Oaks's employer, Giant Food Inc. (Giant); and the State of

Maryland (the State).[1] Giant's Motion for Judgment was granted at the end of Oaks's case. A judgment was entered on a jury verdict against both Oaks and the State in favor of the Connorses. For her injuries, Anna Connors was awarded $84,200 in economic damages and $350,000 in noneconomic damages. Anna and Herbert Connors were awarded $130,000 for loss of consortium.

On Motion for Remittitur filed by the State, the State's liability was reduced to $50,000 pursuant to the Maryland Torts Claim Act. On Motion for Remittitur filed by Oaks, the trial judge determined that the noneconomic damage cap of $350,000 mandated by Maryland Code, § 11–108 of the Courts and Judicial Proceedings Article (CJP), applied in the aggregate to the award of noneconomic damages to Anna Connors and the award of damages to Anna and Herbert Connors for loss of consortium. The trial judge then vacated the award for loss of consortium and reduced it to zero.

On appeal, the Connorses present us the following questions:

I.    Did the trial court err in granting appellee Giant Food's Motion for Judgment at the end of appellants' case by ruling that appellee Oaks was not acting in furtherance of appellee Giant's interests at the time of the accident?

II.   Did the trial court err in applying the noneconomic damage cap found in CJP § 11–108 to the instant case because:

a.   The Connorses proved up to $130,000 in economic injuries in the form of the loss of household services, which are not within the damage cap?

b.   Anna Connorses' claims for her own personal injuries are a distinct claim for damage cap purposes from the

---

1. Although a similar suit filed by Martha and Steve Marris was consolidated for trial with the Connorses' suit, the Marrises have not joined in this appeal.

couples' joint claim for loss of consortium? [2]

c. The damage cap is unconstitutional as it violates the equal protection clause of the fourteenth amendment to the U.S. Constitution and Article 24 of the Maryland Declaration of Rights?

As we shall explain, the trial judge erroneously determined that Giant was not liable to the Connorses on the theory of *respondeat superior*. Moreover, we also conclude that the damage cap mandated by CJP § 11–108 applies separately to the individual award of noneconomic damages to Anna Connors and to the award of damages for loss of consortium to Anna and Herbert Connors. Consequently, we shall remand this case to the Circuit Court for Anne Arundel County for entry of judgment against Giant and reinstatement of the award of damages for loss of consortium.

## Giant Food

At the time of the accident, Oaks was employed by Giant as an ATM Sergeant in Giant's loss prevention department. His duties and responsibilities included standing guard for Giant in its various stores while the ATM machines were repaired. Oaks was required to provide a vehicle for his transportation to and between job assignments. Giant reimbursed Oaks on a mileage basis for this business use of his vehicle ("business mileage").

There was also evidence that Oaks may have been eligible for mileage reimbursement while traveling to and from work ("travel mileage"). As explained on its Mileage Voucher form, Giant's mileage policy was as follows:

For associates regularly traveling for Giant (an average of two or more days a week) you may report the mileage from your nearest Giant store, all business mileage in between, plus mileage back to the originating nearest store. An assignment to one location for more than two months does

---

2. On this issue, the Maryland Trial Lawyers Association filed a brief as Amicus Curiae.

not constitute travel; it is a commuting expense, and may not be claimed for mileage reimbursement.

An employee's nearest or "home" Giant store is used solely in calculating mileage. It is not necessary for an associate receiving travel reimbursement actually to stop at the home store on the associate's journey to or from the associate's work assignments.

On the date of the accident, Oaks was required to report to Giant's facility in Jessup to receive his daily work assignments. The Connorses contend that Oaks was entitled to travel mileage en route to Jessup. On the other hand, Giant contends that Oaks had been assigned to Jessup for more than two months at the time of the accident, so that his travel between home and Jessup was considered commuting, not business travel. It is undisputed, however, that when the accident occurred Oaks was en route to work in Jessup and had "passed" his home store.

In *Dhanraj v. Potomac Electric Power Co.*, 305 Md. 623, 506 A.2d 224 (1986), an employee of PEPCO was temporarily assigned to a six week training course. As the training facility was farther from the employee's home than his permanent work location, the employee was entitled to a travel allowance under a union contract. On his way to the training facility during the fifth week of training, the employee was involved in a serious automobile accident. An injured third party sued both the employee and PEPCO. The Court of Appeals held that PEPCO's payment of a travel allowance for the difference in distance between the employee's usual work location and the temporary training assignment did not, in itself, make PEPCO vicariously liable for the employee's negligence.

The Court of Appeals reviewed the application of the doctrine of *respondeat superior* in the context of the use of an automobile:

The doctrine, which has long been recognized in Maryland, holds an employer vicariously liable for the tortious conduct of an employee when the employee is acting within the scope of the employment relationship. It is thus the

general rule "that a master is liable for the acts which his servant does with the actual or apparent authority of the master, or which the servant does within the scope of his employment, or which the master ratifies with the knowledge of all the material facts." The rule, however, has been to some extent narrowed with respect to automobiles. "[O]n account of the extensive use of the motor vehicle with its accompanying dangers, the courts have realized that a strict application of the doctrine of *respondeat superior* in the modern commercial world would result in great injustice." "It is now held by the great weight of authority that a master will not be held responsible for negligent operation of a servant's automobile, even though engaged at the time in furthering the master's business unless the master expressly or impliedly consents to the use of the automobile, and ... had the right to control the servant in its operation, or else the use of the automobile was of such vital importance in furthering the master's business that his control over it might reasonably be inferred."

The application of the doctrine "rests upon the power of control and direction which the superior has over the subordinate, and ... does not arise when the servant is not actually or constructively under the direction and control of the master." In other words, the doctrine may be properly invoked if the master has, "expressly or impliedly, authorized the [servant] to use his personal vehicle *in the execution of his duties,* and the employee is in fact engaged in such endeavors at the time of the accident." Normally, therefore, while driving to and from his job site, an employee is not acting within the scope of his employment. It is essentially the employee's own responsibility to get to or from work. Thus, the general rule is that absent special circumstances, an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to or from work.

*Id.* at 628, 506 A.2d 224 (citations omitted) (alterations and emphasis in original).

The appellants in *Dhanraj* argued that payment of the travel allowance was a special circumstance, removing the case from the general rule. The Court of Appeals rejected this argument, holding that PEPCO "did not expressly or impliedly consent to the use of the automobile; it had no right to control [the employee] in its operation, and the use of the automobile was not of such vital importance in furthering PEPCO's business that the control over it might reasonably be inferred." *Id.* at 631, 506 A.2d 224. The Court explained why the payment of a travel allowance did not invoke the doctrine of *respondeat superior*:

> There was no consent, express or implied, by PEPCO to the use of [the employee's] automobile as the means of transportation to the training facility; PEPCO was not concerned with how he got there or how he got home at the close of the workday. ... He used his automobile by his own choice and for his personal convenience; he was under no instruction, direction or duty to use it. ... In short, he could travel to and from the facility as he pleased, by any means or route he chose. PEPCO's only concern was that he take the course, not how he got there.

*Id.* at 630, 506 A.2d 224.

Similarly, in *Henderson v. AT & T Information Systems, Inc.*, 78 Md.App. 126, 552 A.2d 935, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989), we held that AT & T's mileage reimbursement to an employee moving from his home in New Jersey to a university in Virginia for a one-year program of graduate study did not bring the employee's travel within the scope of his employment. *Id.* at 139, 552 A.2d 935. During the move, the AT & T employee struck Henderson's van, which was disabled in the center lane of Interstate 95, from behind as Henderson was searching for flares in the back of the van. *Id.* at 129, 552 A.2d 935.

Following a grant of summary judgment in favor of AT & T, Henderson endeavored to distinguish *Dhanraj* by arguing in the alternative that AT & T had (1) required its employee to drive his personal vehicle to the university; (2) consented to

the employee's use of his personal vehicle for transportation to the university; and (3) specifically controlled the use of the employee's vehicle during the trip. *Id.* at 134–35, 552 A.2d 935. We determined that AT & T had not required its employee to drive his personal vehicle to Virginia; that the employee was not engaged in performing his duties for AT & T at the time of the accident; and that setting a maximum mileage did not constitute control over the route to be taken. *Id.* at 135–37, 552 A.2d 935.

In *Sheets v. Chepko,* 83 Md.App. 44, 573 A.2d 413, *cert. denied,* 320 Md. 800, 580 A.2d 219 (1990), Chepko was employed as a floating custodian by the Carroll County Board of Education (the Board), filling in at schools throughout the county for permanently assigned custodians who were absent. *Id.* at 45, 573 A.2d 413. Chepko would be assigned to only one school on any given day, and his job responsibilities were limited to general custodial and maintenance duties. *Id.* at 51, 573 A.2d 413. The Sheetses were injured in an accident in which Chepko was involved while on his way to work, and sued both Chepko and the Board.

On appeal from summary judgment granted in favor of the Board, the Sheetses argued that the Board was vicariously liable for Chepko's negligence under the doctrine of *respondeat superior* because the Board paid Chepko for thirty minutes of travel time before and after his regular work hours each day. After noting that the accident occurred at 2:15 p.m. and Chepko did not begin work until 3:00 p.m., we determined that even if the accident had occurred during the travel time allotted to Chepko, the travel payment would not constitute the type of "special circumstances" required by *Dhanraj* and *Henderson:*

> There is no indication that the Board of Education manifested any consent to, or control over, Mr. Chepko's means of transportation to or from his job which is requisite to render the Board vicariously liable in this instance. He could take any route and any means of transportation to get to work. Chepko's use of his personal vehicle was not of such vital importance to the business of the Board of

Education as to reasonably infer that the Board had control over his use of the vehicle.

*Id.* at 51–52, 573 A.2d 413.

Applying *Dhanraj, Henderson, and Sheets* to the case *sub judice*, we believe that Oaks's possible entitlement to travel mileage on the day of the accident is irrelevant to determining whether Giant is liable for Oaks's negligence.[3] Instead, Giant's vicarious liability for Oaks's negligence, under the theory of *respondeat superior*, can result only from Giant's requirement that Oaks personally supply the vehicle used by him in performing his job assignments.

■ Our review of *Dhanraj, Henderson, and Sheets* leads us to the conclusion that Giant is vicariously liable for Oaks's negligence that led to Anna Connors's injuries. Oaks's position with Giant required driving on a regular basis. Although Giant did not specify the type of vehicle Oaks was required to have (Oaks's Mileage Reimbursement forms indicate the use of two automobiles and a motorcycle), Oaks was required to have a personal vehicle with him at work, so that it was available for Oaks to use in fulfilling his job assignments for Giant. As Oaks did not have the option of using alternative means of transportation to work, his use of his own vehicle was not a matter of choice or personal convenience. At the time of the accident, Oaks was not merely commuting to work, he was transporting the vehicle Giant required him to have available during working hours to the Jessup worksite. In other words, Oaks's use of his personal vehicle at the time of the accident was in furtherance of Giant's business. Its use

---

3. This case demonstrates another reason why a mileage differential paid to compensate for a temporary change in worksites is in and of itself insufficient to establish vicarious liability. If liability is to be based upon the payment of mileage in a situation such as this, one would have to determine whether the vehicle had hypothetically passed the permanent location before the accident occurred. Thus, in the case *sub judice*, Giant would be potentially liable whenever Oaks travelled from his home to Jessup, but would not be liable if Oaks were to stay at the home of a friend located the same distance from Jessup, but in a different direction from that of Oaks's home. Such a result is simply illogical.

was not only consented to, but required by Giant, and was of such importance to the fulfillment of Oaks's job responsibilities that Giant's control over the vehicle can be reasonably inferred.

■ Consequently, we hold that when an employer requires an employee to bring a personal vehicle to work in order that it be available for the employee's use in fulfilling the employee's job-related driving responsibilities, driving the employee's personal vehicle to work is within the scope of the employee's employment. Under such circumstances, the employer is vicariously liable under the doctrine of *respondeat superior* for the employee's negligent operation of that vehicle while en route to work.

On the other hand, this holding is not without limits. First, we are not abolishing the requirement that the employee be acting in furtherance of the employer's business at the time of the accident. If the employee has departed from the employer's business, *i.e.*, from driving his vehicle to the worksite, and is pursuing business of his own, the employer is not vicariously liable. *Cf. Fowser Fast Freight v. Simmont*, 196 Md. 584, 78 A.2d 178 (1951); *National Trucking & Storage, Inc. v. Durkin*, 183 Md. 584, 588, 39 A.2d 687 (1944) ("If the facts show a departure from the master's business, the chain of liability is severed, but if the facts show a mere deviation in the servant's interest, liability still may attach, and the question is one for the jury."). In the same vein, an employer who requires the use of a personal vehicle will generally not be liable for the actions of the employee returning home from work. Once an employee finishes the work day, an employer ordinarily no longer has an interest in, or control over, the use of the employee's vehicle.

■ Finally, we note a definite but subtle distinction between an employer *requiring* that an employee's personal vehicle be available for business use and an employer *permitting* an employee to use a personal vehicle in the course of business. Just because an employer consents to an employee using a personal vehicle in performing job-related duties does

not mean automatically that the employer requires the employee to use that vehicle. In *L.M.T. Steel Products, Inc. v. Peirson*, 47 Md.App. 633, 642, 425 A.2d 242, *cert. denied*, 290 Md. 717 (1981), discussing *Regal Laundry Co. v. Abell Co.*, 163 Md. 525, 163 A. 845 (1933), we said, "The fact that the employer knew the [employee] was using his automobile in carrying out his assignments and agreed to reimburse him for that use sufficed to establish an implied authorization even though there was no evidence that the [employer] had or purported to exercise any control over the details and manner of the [employee's] transportation in general or his driving in particular." Thus, we do not believe that the employee for whom driving is not a component of his primary job responsibilities, *see Henderson, supra*, 78 Md.App. at 136–37, 552 A.2d 935, or who makes only occasional use of his personal vehicle for his employer's benefit falls within the ambit of our holding.

Each case will turn on its own facts, and, as in other cases of this kind, the question of the employer's liability will ordinarily be a question for the jury. Where, however, "but one reasonable inference can be drawn from the undisputed material facts, the question is one of law for the court." *Id.*, 78 Md.App. at 139, 552 A.2d 935. In the case *sub judice*, Giant has conceded that it required Oaks to have a personal vehicle available for his use in the performance of his responsibilities as an ATM Sergeant, and that Oaks was en route to work at the time and place of the accident. We therefore hold that Giant is vicariously liable for Oaks' negligence as a matter of law. We now turn to the matter of damages.

We feel that *Keitz v. National Paving & Contracting Co.*, 214 Md. 479, 136 A.2d 229 (1957), is controlling. Keitz was injured when the bus he was driving was struck by a truck. Keitz sued Ogle, the driver of the truck; Sudbrook, the owner of the truck; and National Paving and Contracting Company (National), for whom the truck was hauling at the time of the accident. At the close of Keitz's case, National was granted a directed verdict. The trial continued, and ultimately judgment was entered against Ogle and Sudbrook and in favor of

Keitz. On appeal, Keitz contended that the trial judge erroneously took from the jury the question of whether, at the time of the accident, Ogle was National's servant. Keitz asked the Court of Appeals to "reverse the judgment in favor of National for costs and remand the same for a new trial on the sole issue as to whether Ogle was National's servant at the time of the accident, treating the issues of negligence and the amount of damages as *res judicata.*" *Id.* at 495, 136 A.2d 229. The Court of Appeals ordered reargument with respect to the appropriate remedy. Following reargument, the Court of Appeals summarized National's position:

> It is argued earnestly that upon the granting of National's motion for a directed verdict, it no longer could offer evidence or prayers, participate in the argument to the jury, or file a motion for a new trial or a *remittitur,* and it would be inherently unfair and burdensome to bind it by a judgment rendered when it was no longer in the case. It is urged that it would not be reasonable or just to require a litigant in National's position either to forego his request for a directed verdict or suffer the vicissitudes of the action. It is suggested, on the one hand, that if one so situated fails to make the motion, he may be the victim of an unjustified jury verdict and, on the other, that if he makes the motion and it be granted, his co-defendants may not adequately protect his interest.

*Id.* at 497, 136 A.2d 229.

A majority of the Court, however, determined that, if found to be vicariously liable for Ogle's negligence, National was a joint tortfeasor and therefore liable over to Ogle as a contributor and indemnitor *pro tanto.* The majority responded to National's concerns as follows:

> We think that the aims and purposes of the Uniform Contribution Among Tortfeasors Act and of the Maryland Rules, the procedural adjuncts to the enforcement of the substantive right of contribution among tortfeasors—*i.e.,* to settle all issues in one suit, will best be served by making the judgment against one tortfeasor conclusive as to liability and amount on the other tortfeasor, where that other partic-

ipated in the case in the manner and to the extent that National did in this case. One who is vouched in but does not participate in the trial at all is nevertheless bound as if he had been a party of record, and we see no reason why, absent unusual circumstances, one who actually participates should not similarly be bound. The case before us demonstrates the desirability and wisdom of doing almost always what was not done here—*i.e.*, of having the jury pass on the liability of all defendants unless nonliability as a matter of law is beyond serious doubt. If the trial court had reversed or denied National's motion and the jury had found against it, the trial court could have granted a judgment N.O.V. if he took the same view of the law he did in granting the motion, and this Court, on appeal, had but to reinstate the verdict if it disagreed on the law.

... As we have noted, we think that any suggested loss of rights by National is largely illusory. It participated in the trial all through the taking of testimony and could have continued on until the end if it had so desired. The question of negligence is substantially conceded, and all evidence on the question of damages would seem to have been presented. There is no reason why the damages which Keitz suffered should be more or less whether Sudbrook alone is responsible for them or whether both National and Sudbrook are responsible for them. This Court is given elasticity of disposition by the Maryland Rules. Rules 871a and 872a and b [now Maryland Rule 8–604(a), (b), (d) ] would seem to enable the Court properly to dispose of any unusual circumstances in which the rule we here lay down might not be in the interest of justice or would work hardship or unfairness on any of the parties.

*Id.* at 502–03, 136 A.2d 229. The Court then remanded the case to the circuit court for trial on the single issue of whether, at the time of the accident, Ogle was National's servant. *Id.* at 505, 136 A.2d 229.

Giant here challenges the *Keitz* majority's reliance upon the principles of indemnification and urges us to reconsider National's arguments. It urges us to follow the *Keitz* dissent and

hold that Giant is entitled to a new trial on damages. That is beyond our purview. As we find no unusual circumstances to remove the instant case from the law established in *Keitz*, we hold that the judgment for damages entered against Oaks, as modified by us, *infra*, is conclusive as to Giant.[4]

## The Damage Cap

### A.

In support of their contention that the trial court erred in vacating their award for loss of consortium, the Connorses first assert that the award was one for economic, rather than for noneconomic damages. They argue that noneconomic damages for loss of consortium were not requested and that sufficient evidence had been presented for the jury to base its award of damages on economic factors.

That an award for loss of consortium is not subject to the cap mandated by CJP § 11–108 to the extent that it encompasses economic damages is now beyond cavil in Maryland. In *Edmonds v. Murphy*, 83 Md.App. 133, 573 A.2d 853 (1990), *aff'd*, 325 Md. 342, 601 A.2d 102 (1992), Mrs. Murphy was seriously injured in an automobile accident. Each side presented expert testimony on the cost of hiring someone to perform the household services that Mrs. Murphy was no longer able to perform. *Id.* at 165, 573 A.2d 853. The verdict sheet presented to the jury asked the jury to specify separate awards for past loss of household services, future loss of household services, and other consortium damages. The Murphys were awarded $245,000 for the first two items, and nothing for the third. *Id.* at 166, 573 A.2d 853. On appeal, we held that "compensation for the damages proved under the joint claim of Mr. and Mrs. Murphy for services which can, but need not necessarily, be performed by hired help, was not includable within the cap." *Id.* at 170, 573 A.2d 853.

---

4. We note that Giant has fully participated in the instant appeal and has briefed and argued its position regarding the remittitur of the loss of consortium award as well as its position regarding its own liability.

The Court of Appeals noted with approval in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), the defendants' decision not to pursue this issue on further appeal. This was because the holding of *United States v. Searle*, 322 Md. 1, 7, 584 A.2d 1263 (1991), that " 'where an award for household services is compensation for the loss of domestic services and is based on the market value of those lost services,' the award is not subject to the [CJP] § 11–108 cap on economic damages" was "dispositive with respect to the awards for loss of household services in this case." *Murphy v. Edmonds*, 325 Md. at 353, 601 A.2d 102.

■ Thus, appellees have not challenged the premise that an award for loss of consortium may encompass both economic and noneconomic elements, with the economic portion of the award not subject to the cap on noneconomic damages. They instead contend that such a distinction was not made in the case at bar and that, based upon the instructions and verdict sheet presented to the jury, the award should be considered to be entirely noneconomic. We agree.

The two aspects of a claim for loss of consortium have been described as the economic "loss of services that . . . [have been performed] though they are of a type that can be rendered by hired help," in contrast to the noneconomic "loss of household and other services that are of such a character that they cannot be rendered by hired help and on which, by reason of their character, no market value can be placed." *Edmonds*, 83 Md.App. at 168, 573 A.2d 853 (alteration in original) (quoting 41 Am.Jur.2d, *Husband and Wife* § 449, at 378). The noneconomic component of a claim for loss of consortium has also been described as "intangible elements [that] are generally described in terms of 'affection, society, companionship and sexual relations.' " *Id.* at 169, 573 A.2d 853 (quoting 2 F. Harper, F. James and O. Gray, *The Law of Torts* § 8.9 (2d ed. 1986)).

In the case *sub judice*, the trial judge gave the jury the following instruction on the claim for damages for loss of consortium:

In the loss of consortium cases, it's a damage to the marital relationship, including loss of society, affection, assistance, loss or impairment of sexual relations, companionship and fellow—fellowship.

In his closing argument, counsel for appellants made the following assertion on their claim on damages for loss of consortium:

... One last item and that will conclude my argument, Judge, if I may? And that is the marriage.

Really, you know, the marital—in the State of Maryland His Honor has told you that it's a joint claim, a joint claim of husband and wife. That there is a separate claim all by itself that's called damage to the marriage.

Now, we're not asking one cent for sex, believe me. Honestly, truthfully, Mrs. Connors would not even want me to bring this up, but the marriage has been damaged. In this case and this is—very rarely do I—do I ever talk to juries about consortium counts, but in this case I think it is most appropriate. This is what the consortium law was really brought about for. It's not so much—it's that—it's that energy that she would come home from work and have with her husband. It's the companionship and it's the things she did and was able to do.

. . . .

The most telling thing that I'll remember out of this was Mr.—Mr. Connors, with his oxygen in his nose, and I was sitting next to him in his deposition, and his big head and his big paws, and wobbly, and he says, you know, I never felt like a burden before this accident. Wow! Can you imagine that? And now I feel like I'm a burden. That's not right, Ladies and Gentlemen. That's what the consortium count is about. These people had a right to live their life the way it was, but for the negligence of these defendants.

The verdict sheet presented to the jury asked, "What damages do you find for Mr. and Mrs. Connors for damages to their Marital Relationship?"

The instruction given the jury for loss of consortium made no distinction between economic and noneconomic damage and clearly addressed only the noneconomic elements of a claim for loss of consortium. Counsel for appellants' initial assertion in his closing argument that appellants were "not asking one cent for sex," does not remove appellants' claim from the realm of noneconomic damages. In addition to concentrating on elements such as "companionship," "energy," and the emotional toll Mrs. Connors's injuries have taken on Mr. Connors, counsel for appellants' closing argument is notable for its failure to address the nature of the household and caretaking functions Mrs. Connors could no longer perform and the pecuniary impact on the marriage of those limitations. Nor does the verdict sheet ask the jury to distinguish between economic and noneconomic damages.

Finally, the jury was not presented by the Connorses with evidence from which it could determine the market value of the domestic services Mrs. Connors was prevented by her injuries from performing. Appellants' reliance in this respect upon *Hughes v. Carter,* 236 Md. 484, 204 A.2d 566 (1964), is misplaced. Testimony in *Hughes* established the sum received by Mrs. Carter when performing household services for others; this served as a basis for determining the value of her services to her own household. Neither Mrs. Connors's wages for work on an assembly line, nor the cost of a visiting nurse are relevant evidence for establishing the market value of the household services Mrs. Connors is no longer able to perform. As what portion, if any, of the $130,000 awarded for the loss of consortium the jury intended as compensation for the economic loss to the Connorses' marriage, we shall treat the entire award as noneconomic.

### B.

Appellants next ask us to answer the question we left for another day in *Edmonds v. Murphy, supra,*[5] by asserting

---

5. We noted in *Edmonds v. Murphy:*  .

that the remittitur was improper because the cap for noneconomic damages should be separately applied to Anna Connors's individual award for noneconomic damages and to Mr. and Mrs. Connors's award for loss of consortium. Oaks contends that the Connorses failed to preserve this issue for our review because it was neither argued nor decided by the trial court. Appellants concede not having made this argument in response to Oaks's Motion for Remittitur, but contend that they asserted briefly at the close of trial that the caps should be separate.

Although we conclude that appellants did not clearly raise below their contention that separate caps should apply, we shall exercise our discretion under Maryland Rule 8–131(a) to consider their arguments. *See Sider v. Sider,* 334 Md. 512, 528 n. 13, 639 A.2d 1076 (1994); *Stewart v. State,* 334 Md. 213, 221 – 22, 638 A.2d 754 (1994); *Medical Waste Associates, Inc. v. Maryland Waste Coalition, Inc.,* 327 Md. 596, 605, 612 A.2d 241 (1992). In doing so, we are mindful of the cautions voiced by the Court of Appeals in *County Council of Prince George's County v. Offen,* 334 Md. 499, 508–10, 639 A.2d 1070 (1994). We believe, however, that the case *sub judice* is more closely analogous to the line of cases represented by *Medical Waste Associates, supra,* than to *Offen.*

In *Medical Waste Associates,* 327 Md. at 603–605, 612 A.2d 241, the Court of Appeals concluded that we had not abused our discretion in considering whether the Maryland Waste Coalition had standing to bring suit under the Maryland Environmental Standing Act (MESA), even though the application of MESA had not been raised in the trial court, because "the general issue of standing had been litigated and resolved in the trial court. MESA was simply another possible basis of

---

... This raises yet another interesting question which, unfortunately was neither raised, tried nor decided by the court below: Since the claim of the marital entity is indeed separate and apart from an injured party's individual claim, does it have a separate cap or is it subsumed into the individual claim for the purpose of applying the cap? We leave the answer for another day.

*Edmonds v. Murphy, supra,* 83 Md.App. at 170 n. 26, 573 A.2d 853.

support for the Coalition's claimed standing in this case." *Id.* at 605, 612 A.2d 241. *See also Watson v. Peoples Security Life Insurance Co.,* 322 Md. 467, 483, 588 A.2d 760 (1991) (in determining "issue" of whether employee's discharge was violation of "clear mandate of public policy," court considered new "argument" based upon sexual harassment); *Crown Oil & Wax Co. v. Glen Construction Co.,* 320 Md. 546, 561, 578 A.2d 1184 (1990) (successor-in-interest theory advanced for first time on appeal was not "new issue, but [ ] an additional argument for direct arbitration" between the parties);[6] *O'Leary v. Shipley,* 313 Md. 189, 196, 545 A.2d 17 (1988) (First Amendment theory different from that advanced at trial considered because "general question of the application of the First Amendment" was tried and decided).

In the case *sub judice,* the trial court decided the general question of the application of the damage cap to the appellants's award. Although appellants did not argue separate application of the cap to Mrs. Connors's noneconomic damage award and the Connorses' joint loss of consortium award in response to Oaks's Motion for Remittitur, the trial court implicitly decided that the cap applied to the aggregate of the claims when it (1) *sua sponte* raised the issue of the cap after releasing the jury, and (2) granted the remittitur. Appellees are not prejudiced by our considering the matter because the issue is purely one of statutory construction, requiring no evidentiary foundation, and the parties fully briefed and argued the issue before us.[7] *Cf. State v. Bell,* 334 Md. 178, 189,

---

**6.** *Crown Oil* is cited in *Offen* for the proposition that the Court of Appeals has "recognized on occasion that an appellate court possesses discretion to consider matters that were not relied upon by the trial judge, or perhaps not even raised by the parties." *Offen,* 334 Md. at 508, 639 A.2d 1070. *Offen* does not purport to overrule or disapprove the grounds upon which the court exercised its discretion in *Crown Oil.*

**7.** Appellants raised the question of separate application of the damage cap and adopted the arguments in favor of separate application contained in the amicus curie brief filed on behalf of the Maryland Trial Lawyers Association. Appellee Giant expressly adopted Appellee Oaks's arguments supporting application of the cap to the aggregate of appellants' awards.

638 A.2d 107 (1994); *Offen,* 334 Md. at 510, 639 A.2d 1070. We therefore consider and decide the question of whether the damage cap should be applied to the aggregate of Mrs. Connors's individual award of noneconomic damages and the Connorses' joint award for loss of consortium.[8]

A claim for loss of consortium as we now know it was defined by the Court of Appeals in *Deems v. Western Maryland Railway,* 247 Md. 95, 231 A.2d 514 (1967). A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the spouse of a person physically injured by the tortious conduct of a third person. *Klein v. Sears, Roebuck and Co.,* 92 Md.App. 477, 493, 608 A.2d 1276, *cert. denied,* 328 Md. 447, 614 A.2d 973 (1992). Such a loss also adversely affects the spouse who was physically injured. *Deems,* 247 Md. at 108–09, 231 A.2d 514. Accordingly, a claim for loss of consortium is brought jointly by husband and wife seeking compensation for the injury to the marital relationship. *Id.* at 115, 231 A.2d 514. Although a claim for loss of consortium must be adjudicated concurrently with the individual claim of the physically injured spouse, *id.,* the claim for loss of consortium is a separate and distinct cause of action. *Id.* at 114, 231 A.2d 514; *Edmonds v.*

---

**8.** We note also that, although *Offen* emphasizes an appellate court's discretion to "raise an issue *sua sponte* in a situation in which a lower court decided a case correctly but reached its result through faulty analysis ... provided the record is adequate to support that [alternative] ground," *Offen,* 334 Md. at 509, 639 A.2d 1070, there have been a number of occasions on which the Court of Appeals has reversed or vacated the judgment of a lower court based in whole or in part on its consideration of a new issue. *See Sider, supra,* 334 Md. at 525–30, 639 A.2d 1076; *Stewart, supra,* 334 Md. at 221 – 22, 638 A.2d 754; *Fairbanks v. McCarter,* 330 Md. 39, 45–46, 622 A.2d 121 (1993); *Richmond v. State,* 330 Md. 223, 235–36, 623 A.2d 630 (1993); *Watson, supra,* 322 Md. at 483–84, 588 A.2d 760; *O'Leary, supra,* 313 Md. at 196, 545 A.2d 17; *Taub v. State,* 296 Md. 439, 441, 463 A.2d 819 (1983); *see also Medical Waste Associates, supra,* 327 Md. at 603–05, 612 A.2d 241 (approving our vacating the judgment of a circuit court based upon an argument presented for first time on appeal).

*Murphy, supra,* 83 Md.App. at 170 n. 26, 573 A.2d 853.[9]

CJP § 11–109(b) requires that all personal injury awards be itemized:

(b) *Itemized award.*—As part of the verdict in any action for damages for personal injury ... the trier of fact shall itemize the award to reflect the monetary amount intended for:

(1) Past medical expenses;

(2) Future medical expenses;

(3) Past loss of earnings;

(4) Future loss of earnings;

(5) Noneconomic damages; and

(6) Other damages.

Section 11–108(a) defines noneconomic damages:

---

**9.** The requirement that the two actions be joined for trial was intended to ameliorate concerns that independent suits would allow "double recovery," or overlapping awards. Thus, the Court of Appeals cautioned in *Deems:*

When the suit of the physically injured spouse is tried with the joint action for injury to the marital relationship, the jury should be instructed in detail, where appropriate, as to the particular matters for which compensation is to be made to the physically injured spouse in his or her separate action, if there be a recovery, and the matters to be considered only in fixing the damages in the joint action. For example, if the husband is injured as a result of the defendant's negligence and his injuries include loss or diminution of sexual capacity, he is entitled to compensation therefor, but the amount of recovery for that element, if any, is to be fixed only after taking into consideration the amount awarded for the loss to the marital relationship by reason of such injury during the joint life expectancy of the husband and wife.

*Deems, supra,* 247 Md. at 114, 231 A.2d 514.

Appellee Oaks implies that the cap has the function of preventing double recovery, asserting that Mrs. Connors "would receive $350,000 award for her non-economic damages, including in part her inability to care for her husband to the satisfactory level she enjoyed before her injuries. A separate cap on the consortium award would allow Mrs. Connors to receive a double recovery on that loss because the award goes to the spouses jointly." Instructed in accordance with *Deems,* a jury would distinguish between the effect on the marriage of Mrs. Connors' diminished ability and the effect upon her personally before determining the amount of the respective awards. The adequacy of the jury instructions has not been challenged on this appeal.

(1) "Noneconomic damages" means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

(2) "Noneconomic damages" does not include punitive damages.

■ We do not believe that the legislature intended, by including loss of consortium within the definition of noneconomic damages, to abrogate *Deems* and reduce loss of consortium from a separate cause of action to a damage element of the underlying claim for damages for personal injury. Instead, we believe its inclusion in § 11–108(a)(1) establishes only that, unless specifically designated as compensation for pecuniary loss of household services, *United States v. Searle, supra,* 322 Md. at 7, 584 A.2d 1263, an award for loss of consortium is by definition nonpecuniary and therefore subject to the cap imposed upon noneconomic damages.

■ Section 11–108(b) mandates that "in any action for damages for personal injury ... an award for noneconomic damages may not exceed $350,000." An action for personal injuries and a claim for loss of consortium are separate causes of action that, as we have said, must be consolidated for trial. The plaintiffs in each action are different—the physically injured spouse has an individual claim in the action for personal injuries, and the husband and wife jointly have a claim for loss of consortium. If a single cap applies to the two actions, several concerns arise that were addressed by Judge Garbis in *Bartucco v. Wright,* 746 F.Supp. 604 (D.Md.1990), in support of his determination that the cap should be individually applied to each wrongful death plaintiff.[10]

■ Section 11–108(d)(2) requires any award for noneconomic damages exceeding the limit of $350,000 established by

---

10. Judge Garbis's determination, although merely predictive of how he believed the Court of Appeals would answer the question before him, and therefore not binding upon us, was rendered moot by *United States v. Striedel,* 329 Md. 533, 620 A.2d 905 (1993). *Striedel* held that the cap does not apply at all to actions for wrongful death. Nonetheless, we find his reasoning to be persuasive.

§ 11–108(b) to be reduced by the trial court to conform to that limitation. Reading this requirement in light of the itemized award required by § 11–109, it is clear to us that the legislature envisioned a simple reduction of one item from an amount more than $350,000 to $350,000. In a case such as that now before us, however, the trial court is placed in the position of determining, without statutory guidance, how the award of $350,000 is to be allocated between two distinct plaintiffs. *See Bartucco,* 746 F.Supp. at 608; *see also United States v. Striedel,* 329 Md. 533, 551, 620 A.2d 905 (1993). It is suggested by Oaks that the trial court should require the plaintiffs to specify how the award is to be apportioned, as did the trial court in the case *sub judice.* It cannot be assumed, however, that the plaintiffs will always reach an amicable solution. Further, if one of the plaintiffs is aggrieved by the trial court's remittitur, the lack of statutory guidance provides no standard for appellate review.[11]

Additionally, in cases where a spouse has been seriously injured, the application of a single cap may have the effect of eviscerating the award for loss of consortium, making such a claim a meaningless procedural exercise. The substantive

---

**11.** Existing law on remittitur would not guide an appellate court in such a situation. Ordinarily, remittitur is an option offered to plaintiffs to avoid a new trial when the trial judge has found the verdict returned by the jury to be excessive. *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988). Once the plaintiff has acquiesced to remittitur, the lesser award may be challenged only by cross-appeal. *Surratt v. Prince George's County,* 320 Md. 439, 457–461, 578 A.2d 745 (1990). On appeal, the question presented is whether the trial judge "abused his discretion in finding the jury's verdict unreasonable in amount." *Franklin v. Gupta,* 81 Md.App. 345, 362, 567 A.2d 524, *cert. denied,* 319 Md. 303, 572 A.2d 182 (1990). There is no such finding in cases involving the cap imposed on noneconomic damages.

An interesting question is also raised as to whether the spouse not physically injured could appeal the trial court's remittitur as it affected the award for loss of consortium, without being joined by the physically injured spouse, who may be satisfied with the allocation of a greater portion of the award of $350,000 to him- or herself individually. There is an inherent conflict of interest between the spouse who was physically injured and spouse who was not physically injured, who, although married, may be affected differently by the decision of the trial court on remittitur.

right of the spouse not physically injured to receive compensation, *see Phipps v. General Motors Corp.*, 278 Md. 337, 355–56, 363 A.2d 955 (1976), together with the physically injured spouse, for the damage caused the marital relationship by the tortious conduct of the defendant may be eliminated, rather than just limited. We shall not reach such a result based simply upon § 11–108(a)(1) without further indication that that is what the legislature intended.

■ We conclude that by including loss of consortium within § 11–108(a)(1), the legislature intended only to make an award for loss of consortium, to the extent that it is not compensation for loss of household services, subject to the cap imposed upon noneconomic damages. We do not believe that it was the intent of the legislature to reduce a claim for loss of consortium from a separate cause of action to an element of an award of noneconomic damages to the physically injured spouse. Thus, the cap imposed upon noneconomic damages is to be separately applied to the award of noneconomic damages to the injured spouse and to the award of noneconomic damages contained in the award for loss of consortium. We shall therefore order the trial court to reinstate the award of $130,000 returned by the jury in favor of Mr. and Mrs. Connors for loss of consortium.

## C.

In view of the above, we need not reach appellants' final question.

### Remand

At the close of trial, judgment was entered in favor of Anna Connors, individually, against Oaks and the State, jointly and severally, in the amount of $434,200 for the physical injuries suffered by Mrs. Connors, and in favor of Anna and Herbert Connors, jointly, against Oaks and the State, jointly and severally, in the amount of $130,000 for loss of consortium. Following post-trial motions, the award for loss of consortium was vacated, and the judgment was modified to reflect an

award in favor of Anna Connors against Oaks and the State, jointly and severally, in the amount of $50,000, and an award in favor of Anna Connors against Oaks, individually, in the amount of $384,200. On remand, the judgment should be modified to reinstate the award of $130,000 for loss of consortium in favor of Anna and Herbert Connors jointly against Oaks and Giant, jointly and severally; to reflect an award in favor of Anna Connors, individually, against Oaks, Giant, and the State, jointly and severally, in the amount of $50,000 [12]; and to reflect an award in favor of Anna Connors, individually, against Oaks and Giant, jointly and severally, in the amount of $384,000.

**JUDGMENT IN FAVOR OF GIANT FOOD INC. REVERSED; ORDER OF REMITTITUR REVERSED IN PART; JUDGMENT AFFIRMED IN ALL OTHER RESPECTS.**

CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS TO REINSTATE THE AWARD OF $130,000 FOR LOSS OF CONSORTIUM IN FAVOR OF ANNA AND HERBERT CONNORS AGAINST WILLIE JAMES OAKS AND TO ENTER JUDGMENT AGAINST GIANT FOOD INC. AND THE STATE OF MARYLAND IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEES.

---

12. The limits of State liability under the Maryland Tort Claims Act are $50,000 per claimant for all injury, loss, and damage to person and property arising from a single incident. COMAR 25.02.02.02(D)(1). All persons claiming damages resulting from bodily injury to, or the death of, any one person shall be considered to be one claimant. COMAR 25.02.02.02(D)(1)(a). The parties agreed at the time of the original remittitur that the entire $50,000 would be allocated to Anna Connors.